IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
June 27, 2017 Session

## STATE OF TENNESSEE v. LAVONTE DOMINIQUE SIMMON[1]

**Appeal from the Criminal Court for Knox County**
**No. 101910B      Steven W. Sword, Judge**

_____

### No. E2016-01582-CCA-R3-CD
_____

The Defendant, Lavonte Dominique Simmon, appeals as of right his jury convictions for first degree premeditated murder and two counts of aggravated assault.  On appeal, the Defendant alleges the following errors: (1) that the Defendant was deprived of his right to present a viable defense when the trial court permitted Charles Maples to assert the privilege against self-incrimination and, thereafter, refused to allow defense counsel to withdraw so that defense counsel could testify about Mr. Maples' past statements; (2) that the trial court improperly denied the Defendant's motion to dismiss the indictment after the State failed to preserve exculpatory evidence in the form of Mr. Maples' testimony; (3) that the trial court should have granted the Defendant's motion to suppress his statement to the police in light of testimony that the Defendant suffered a brain injury causing intellectual impairment, that the Defendant invoked his right to counsel, and that the Defendant did not voluntarily waive his Miranda rights; (4) that the trial court erred by allowing the State to introduce numerous photographs of weapons, weapons-related items, and ammunition found during the search of the home where the Defendant was apprehended; (5) that the evidence was insufficient to support the Defendant's convictions because the State failed to prove that the Defendant was the person who shot the murder victim or that the Defendant acted with premeditation; and (6) that the trial court should have instructed the jury on diminished capacity.[2]  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

_____

[1] Multiple documents in the technical record, including the judgment forms, spell the Defendant's last name as "Simmons."  The Defendant, himself, stated his name as "Simmons" at trial.  However, as is the policy of this court, we will refer to Defendant as "Simmon," the way his last name appears in the indictment.

[2] We have consolidated and reordered the issues on appeal for clarity.

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT L. HOLLOWAY, JR., JJ., joined.

Douglas A. Trant (on appeal), Knoxville, Tennessee; Mark E. Stephens, District Public Defender (at trial); and Eric Lutton and Jonathan Harwell, Assistant Public Defenders (at trial), for the appellant, Lavonte Dominique Simmon.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Charme P. Allen, District Attorney General; and Leslie R. Nassios, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
FACTUAL BACKGROUND

Following a drive-by shooting at the home of Charles Maples and Uniqua Brown, the Defendant, along with co-defendant Shawn O'Neill,[3] was indicted for the first degree premeditated murder of Uniqua Brown and the aggravated assaults of Jasmine and Akeem Hollingsworth, both of whom were also present. See Tenn. Code Ann. §§ 39-13-102, -202. The Defendant filed multiple pretrial motions, including a motion to suppress his statement to the police, a "motion in limine" seeking suppression of much of the evidence found at the residence where he was apprehended, and a motion to dismiss the indictment based upon a Ferguson violation. Defense counsel also filed a motion to withdraw, so they could testify on the Defendant's behalf about statements Mr. Maples made to them. The case proceeded to trial on May 11 through May 15 of 2015.

A. Shooting. On June 7, 2013, siblings Jasmine and Akeem Hollingsworth[4] were standing in the driveway of 1430 Nolan Avenue talking with one of the residents of that home, Uniqua Brown. Ms. Brown was sitting in the passenger seat of a Chevy Caprice that belonged to her boyfriend Charles Maples, who also lived in the residence ("the Brown-Maples residence"). Mr. Maples had just taken the couple's three-day-old twins inside the house.

As the Hollingsworths and Ms. Brown were in the driveway talking, the Defendant's green Camry approached. As the car passed by, the Defendant, who was in the passenger's seat, made eye contact with Akeem, and Akeem recognized the

---

[3] Co-defendant O'Neill's case was severed from the Defendant's, and Mr. O'Neill testified against the Defendant.

[4] Several individuals referenced in this opinion share the same last name. Accordingly, we will refer to them by the first names when needed. We intend no disrespect by doing so.

Defendant because they went to school together. The Camry then stopped at "the neighbor's driveway," and the Defendant "pulled out" an AK-47 and "opened fire" on the group. It all "happened pretty quickly[,]" and both of the Hollingsworths dropped to the ground to avoid the gunfire.

The green Camry sped away, and the shooting stopped. Akeem suffered a "very minor injury" to his side, and Jasmine was uninjured. Ms. Brown ultimately died as a result of her wounds.

B. Police Response and Investigation. Officers received "a call to 1430 Nolan in Knoxville around 11:45 a.m." Knoxville Police Department ("KPD") Officer Brian Bumpus was the first to arrive. Officer Bumpus described the scene as he approached the residence: "[T]here were several people standing outside, fairly frantic running around. I could tell that somebody was being tended to. . . . So I exited my vehicle, I walk around the front of it and then could see the victim laying [sic] there on the ground." According to Officer Bumpus, Ms. Brown "had a rather large wound . . . to her left side." Although someone was performing CPR on Ms. Brown, Officer Bumpus thought she was likely deceased due to the size of the wound. The ambulance arrived and took Ms. Brown to the hospital.

Officer Bumpus received a description of the suspect vehicle, and the shooter was identified as "Dominique Simmon[]." Thereafter, a "be-on-the-lookout" ("BOLO") was issued for the Defendant's vehicle.

Officer Bumpus had "two people that [he] believed to be good witnesses," so he had them sit in the back of his police car to keep them from leaving the scene. These two witnesses turned out to be Jasmine and Akeem Hollingsworth. After spending approximately ten minutes on the scene, Officer Bumpus took the Hollingsworth siblings to the police department, so they could each give a statement to investigators. Officer Bumpus described them as "obviously very traumatized by what had happened."

Officer Bumpus's cruiser's equipment recorded "everything," and the recording was admitted as a trial exhibit. It provided video of Officer Bumpus's arrival on the scene, as well as audio. In addition to Officer Bumpus's conversation with those on the scene, the Hollingsworths' dialog while they sat in the car was likewise recorded.

On redirect, Officer Bumpus agreed that it was "inherently more dangerous to have a drive-by [shooting] in the daytime." Officer Bumpus also clarified that the man on the video who said he could not identify shooter was also the same person who was frantic and said "my wife is dead."

After the BOLO went out, the Defendant's car was spotted parked on Gross Avenue. As Lieutenant Gauffney[5] approached the vehicle, he "was flagged down by a passerby on foot," who told him that "the people ran from that car" into the residence at 1605 Moses Avenue ("1605 Moses"). Shortly thereafter, officers surrounded the three-story home, and three people emerged from inside—Braxton Williams, Andre Harshaw, and Ray Johnson. Teressa Williams was the owner of 1605 Moses, and she lived there with her children, Braxton, Bronson, and Blair Williams. Ms. Williams, who had arrived on the scene, gave consent to search, and the SWAT team went inside. They found the Defendant and Shawn O'Neill hiding underneath a pile of clothes in the basement.

After the Defendant was taken into custody, a search warrant was obtained for 1605 Moses. An abundance of evidence from 1605 Moses was introduced at trial, including weapons, weapons-related items, and ammunition. It was unknown if the items found inside the house belonged to the Defendant.

Officers also examined the scene at the Brown-Maples residence, 1430 Nolan Avenue, as well as the two adjoining residences, 1428 to the east and 1434 to the west. Seven bullets hit the Brown-Maples residence in total—four entering the house, and three striking the screened-in front porch area. Four bullets in total hit the residence next-door at 1434—three hitting the carport and continuing into the house, and one going straight into the house. Additionally, one "bullet defect" of unknown origin was observed on the far side of 1434 possibly "from a prior incident in the neighborhood[.]"

Moreover, several vehicles were damaged. A black Chevrolet Trailblazer parked in the driveway at 1428 had seven bullet holes in the driver's side and three holes on the passenger's side, suggesting that several projectiles had passed through the vehicle. A "possible eighth bullet" flattened the Trailblazer's left front tire. Furthermore, one bullet struck the ground near that vehicle.

At 1430, the Chevrolet Caprice that Ms. Brown was sitting inside had three holes on the driver's side, and five defects in the windshield that were caused by "one or more" bullets fragmenting after hitting something. To the untrained eye, it might have appeared that something hit the windshield directly. In addition, two fragments were found inside the Caprice. A maroon Buick Park Avenue, parked in front of the Caprice, had six bullet holes to the driver's side.

The damage to these vehicles and residences all came from an easterly direction. Immediately following the shooting, police discovered thirty-two spent 7.62 x 39 shell casings in the road just to the east of the Brown-Maples residence in front of the house at 1428.

---

[5] This officer's first name is not apparent from the record.

A GMC Envoy diagonally parked in yard of the Brown-Maples residence just to the left of the Caprice, had a bullet hole in the right, rear passenger's side. It was noted in the ballistics report that the bullet hole in the Envoy could "have been caused by return fire." In addition, four live 9mm rounds were located near the rear bumper of the Envoy. In front of the Envoy "to the right and around [a] little doghouse area," four spent .45 caliber shell casings, by two different manufacturers, were discovered.

C. Co-defendant's Testimony. Shawn O'Neill, the co-defendant and driver of the Camry, testified at the Defendant's trial. Mr. O'Neill knew the Defendant because their parents "were together" for ten years. According to Mr. O'Neill, he, the Defendant, and the Defendant's younger brother, Daquawn, had lived in Memphis in the same household for several years, and Daquawn was approximately two years younger than the Defendant. Mr. O'Neill testified that, when they "all bec[a]me of age," they moved out of their parents' home. In June of 2013, Mr. O'Neill and Daquawn still lived in Memphis, but the Defendant had moved to the Knoxville area. According to Mr. O'Neill, the Defendant "was always back and forth because his mom lived in Knoxville, and his dad lived in Memphis."

During the first week of June 2013, Daquawn asked Mr. O'Neill if Mr. O'Neill would drive him to Knoxville because Daquawn had a court date but no valid driver's license. Mr. O'Neill agreed, knowing that Daquawn was carrying a fairly large amount of cash on him for court costs and fines. According to Mr. O'Neill, they left Memphis that Wednesday[6] evening around 7:00 or 8:00 p.m., and this was Mr. O'Neill's first trip to Knoxville.

When they arrived at approximately 4:30 the following morning, June 6, 2013, they went to Braxton Williams's house—1605 Moses. Later that afternoon, the Defendant came over to the residence, and he was driving a green Toyota Camry, according to Mr. O'Neill. Mr. O'Neill left with the Defendant and "hung out with him all day because [he] hadn't seen [the Defendant] in almost a year." Daquawn stayed behind with Braxton. Although they went by 1605 Moses once more that evening, Mr. O'Neill and the Defendant ultimately spent the night at the Defendant's home.

Mr. O'Neill testified that he was awakened the following morning about 11:00 a.m. by the Defendant: "[The Defendant] taps me on the leg and he says, wake up, we've gotta go over to check on Daquawn because he got robbed last night." So they got in the Defendant's Camry and drove to the Williams's home at 1605 Moses. According to Mr. O'Neill, when they arrived, there was group sitting outside on the balcony talking; this group included Jasmine Hollingsworth, an eventual victim. Mr. O'Neill said that Daquawn was sitting down, and "[e]verybody was pretty much talking about . . . what

---

[6] Wednesday was June 5.

happened and stuff, you know, where . . . was he at when he got robbed and all that stuff." Daquawn had reported the robbery to the police, but he did not think they could help much.

According to Mr. O'Neill, while Daquawn did not identify the robbers, Daquawn did say that "he thought a guy named Little Tony[7] had something to do with it" and that, after they robbed him, they "made him walk back naked" to 1605 Moses. This information, Mr. O'Neill said, made the Defendant even angrier. The Defendant said, "I'm tired of stuff like this happening[.]" However, Daquawn "really wasn't like saying or doing anything, he was just sitting there[,]" and Mr. O'Neill was "more frustrated at the fact that . . . [Daquawn] didn't have . . . any money or anything for [them] to get back home[.]"

The Defendant and Braxton went inside the house, and the Defendant emerged with an AK-47 in his hands. Jasmine was "act[ing] kind of scared" at that point and left, according to Mr. O'Neill. A short time thereafter, Blair Williams made a phone call to Jasmine, and during that call, the Defendant "got up" and said, "I'll be back." The Defendant, armed, got in the Camry alone and left. Mr. O'Neill assumed that the Defendant was going to find Mr. Dixson, aka "Little Tony." However, the Defendant returned about five minutes later, got out of the car with the gun, and started to converse with the group again. The Defendant told them that "[h]e didn't see anybody out there."

After that, Blair was on the phone with Jasmine again, and she put Jasmine on speaker phone. According to Mr. O'Neill, "all of the sudden . . . there was [sic] voices heard over the speaker phone[,] and somebody busted out and said, they're over there, they're over there, because they're telling [Jasmine] to hang up the phone, hang up the phone." Mr. O'Neill testified that, in response, he and the Defendant got in the Camry. Mr. O'Neill was driving. Mr. O'Neill said that Daquawn tried to talk them out of going to find Mr. Dixson, saying, "[D]on't worry about it, I've already filled out a police report." They went anyway.

The Defendant, who had brought the AK-47 with him, gave directions to Mr. O'Neill as he drove because Mr. O'Neill did not "know where to go" being unfamiliar with the area. After turning onto Nolan Avenue, they spotted Jasmine's car. The Defendant instructed Mr. O'Neill "to go slow[,]" and he "pulled the gun out the window." Mr. O'Neill said that he then saw "movement out of [his] peripheral, but [he] never looked directly at the house." The Defendant "opened fire" just as they passed the Brown-Maples residence, according to Mr. O'Neill. Mr. O'Neill did not see anyone else shooting and did not hear any other shots being fired. The Defendant then said "go, go[.]" Mr. O'Neill "hit the gas," and the Defendant directed him back to 1605 Moses.

---

[7] This was a nickname for Tony Dixson.

When Mr. O'Neill was asked, "[The Defendant] certainly knew what he was gonna do a couple of minutes before, didn't he?" Mr. O'Neill replied, "It seemed like it."

When they arrived at 1605 Moses, the Defendant ran into the house and told Mr. O'Neill to hide the car. Mr. O'Neill claimed that he never saw the AK-47 again. Mr. O'Neill parked the car next to a nearby park and "walked back to Braxton's house across the park." Once Mr. O'Neill returned to 1605 Moses, they were "running around trying to figure out what to do," and about ten or fifteen minutes later, the police had the house surrounded. The Defendant and Mr. O'Neill went "downstairs to the bottom part[,] like where there's a garage and storage areas," and hid underneath "a bunch of stuff" before being apprehended.

Mr. O'Neill also testified that he had a conversation with the Defendant the Monday before the trial began. According to Mr. O'Neill, the Defendant requested that Mr. O'Neill "help him out" by saying that "it wasn't [the Defendant] in the car, it was [Mr. O'Neill] that was driving and . . . Daquawn was the one that was shooting." Although Mr. O'Neill agreed at the time, he testified that he "wouldn't do that" despite the fact that it was hard for him to testify against the Defendant.

On cross-examination, Mr. O'Neill testified that, in addition to Tony Dixson, Akeem Hollingsworth's name was mentioned as a potential robber by Daquawn. According to Mr. O'Neill, that was the reason Jasmine left 1605 Moses when she did "because she was going to get her brother," Akeem. Mr. O'Neill further stated that Jasmine was present when Daquawn described that he had been stripped of his clothes during the robbery. Mr. O'Neill also affirmed that Daquawn would have gone to jail without his money for court.

Mr. O'Neill asserted that he "willingly got in the car" with the Defendant and that he knew "the reason for going over there," although it had not been specifically stated by the Defendant. Mr. O'Neill maintained that the "purpose of going over there [was not] to try and get the money back."

When asked where he saw movement in yard of the Brown-Maples residence, Mr. O'Neill replied, "[F]rom the back of a truck that was kind of parked diagonally across the grass and the front of the Chevy, there was some movement in that area. Other than that, I didn't see any movement . . . anywhere else out of my peripheral." Mr. O'Neill was referring to the GMC Envoy in the yard. Mr. O'Neill also admitted that he was "playing with" his phone when they were "rolling up" to the Brown-Maples residence.

When asked if it was possible that someone else fired in addition to the Defendant, Mr. O'Neill said, "I don't think so" because all he "heard was the rapid fire" from the Defendant's weapon. Mr. O'Neill acknowledged that he had previously spoken with the

assistant district attorney and that he indicated to her that, although he was "not a hundred percent sure," "[he] believe[d] a shot had been fired" by someone else first "[a]t one point in time." On redirect, Mr. O'Neill further explained that he told the prosecutor "that it was possible that it was a shot [the Defendant] fired off before he sprayed."

C. The Defendant's Statement. After the Defendant was taken into custody, he was escorted by a patrolman from 1605 Moses to the police station and was placed in an interview room where he remained shirtless and handcuffed. At 2:24 p.m., KPD Investigator Jason Booker began to interview the Defendant. This video recording was admitted as an exhibit.

During the interview, the Defendant denied shooting anyone or having any knowledge of the robbery involving his brother Daquawn. According to the Defendant, he "was already inside" 1605 Moses and did not run from any car. In addition, the Defendant told Investigator Booker that his Camry had been stolen the evening before and that Shawn O'Neill had just arrived in Knoxville that morning. In addition, the Defendant asked Investigator Booker, "Listen, where is the gun at? If I . . . did that, where's the gun at?"

The Defendant sat in the interview room for a while after the initial questioning by Investigator Booker. KPD Investigator Brandon Wardlaw entered the room sometime later, accompanied by a gunshot residue technician. While the gunshot residue technician was swabbing the Defendant's hands and face, the Defendant and Investigator Wardlaw conversed. The Defendant stuck by his initial story. Additionally, the Defendant explained that, if the test was positive, it was because he had shot a gun "in the woods" the day before. The Defendant told Investigator Wardlaw that he lived in Sevierville.

At several points during the recording the Defendant was left alone in the interview room. During these moments, he expressed concern that he was "going to jail," that his "life [was] over," and that he would not see his son again. At one point, the Defendant cried out, "Lord, I'm so sorry. I don't want my kid to grow up with anybody else." Investigator Booker, with use of noise cancelling headphones, was able to hear the Defendant say, "God, forgive me, clearly, I f—ked up." The Defendant was also taken for fingerprinting while he waited.

D. Mr. Maples' Statements. Because Mr. Maples was unavailable due to his invoking his right against self-incrimination, an agreed-upon stipulation between the parties was read to the jury and entered as an exhibit, and it relayed what Mr. Maples' trial testimony would have been had he been available. Contained in the stipulation, Mr. Maples said that Tony Dixson took his car during the early morning hours of June 7, returning it around 7:30 a.m. According to Mr. Maples, Mr. Dixson told Mr. Maples that, while he was gone with the car, he and Shaquan Andrews had robbed Daquawn. Mr.

Maples did not know whether Akeem Hollingsworth was involved in Daquawn's robbery.

Mr. Maples said that, later that day, he and Ms. Brown went looking for strollers for their three-day-old twins. According to Mr. Maples, Jasmine Hollingsworth called him while they were in route to the store and "warned him the Moses men were looking to shoot them." Jasmine told Mr. Maples that she was on her way to his house. When Mr. Maples and Ms. Brown returned home, Mr. Maples saw Mr. Dixson's "car backed up in the driveway," Mr. Andrews's girlfriend's car "in the driveway ahead of him[,]" and Jasmine's car parked on the street. Ms. Brown instructed Mr. Maples "to get them out of the house."

While Mr. Maples was getting one of the twins out of the car, he saw the Defendant "slowly" drive by the house in the Defendant's green Camry. According to Mr. Maples, the Defendant spoke to him, asking him, "What's up?" The Defendant travelled on out of Mr. Maples' view.

Mr. Maples said that he then took the twins inside while Ms. Brown waited in the car. According to Mr. Maples, Jasmine, Akeem, Mr. Andrews, Mr. Dixson, and "Little Ty" were all inside his home, but he told them they had to leave. Mr. Maples said that, at that time, he saw Mr. Dixson with a .45 caliber handgun and Mr. Andrews with a 9mm.

Approximately five to seven minutes had passed before Mr. Maples went back outside. Mr. Maples agreed that Jasmine, Akeem, Mr. Dixson, and "Little Ty" exited the residence before he did. According to Mr. Maples, Mr. Dixson moved into the yard, though Mr. Maples did not see where Mr. Dixson went, and Mr. Maples and Mr. Andrews were on the screened-in porch when the shooting occurred. Mr. Maples said that he did not see Mr. Dixson or Mr. Andrews holding a gun as they exited, and Mr. Maples was unsure if anyone else fired besides the passenger of the Camry. Mr. Maples identified the shooter as Daquawn, but he was "not certain." According to Mr. Maples, Mr. Dixson, Mr. Andrews, and Little Ty fled immediately.

In addition to the stipulation, a video recording of Mr. Maples June 13, 2013 interview with Investigator Chaz Terry was likewise made a trial exhibit. Mr. Maples was very emotional immediately after the shooting so he was not interviewed until several days later. During the interview, Mr. Maples was very concerned about the damage done to the windshield of his Chevy Caprice, thinking that possibly one of the people coming from inside his house had fired the shot that killed Ms. Brown. According to Mr. Maples, he saw Mr. Dixson with a .45 handgun, Mr. Andrews had an SKS rifle "in his hand," and Akeem had a 9mm when they came out of his house that day. However, he said that he did not see "nobody return no [sic] fire." He said that Mr. Andrews left the SKS on his front porch after the shooting and that he took the SKS next-door before

-9-

the police arrived. Mr. Maples also claimed that the Defendant was the one driving the Camry and was not the shooter, but that it was the Defendant's "little brother" from Memphis with dreadlocks, whom Mr. Maples had met the night before. In addition, Mr. Maples stated that Akeem Hollingsworth was not involved in the robbery of Daquawn but noted that Akeem was very close with Mr. Dixson. At one point during the interview, Mr. Maples asked, "Can I ask you a question? Do you feel like I had something to do with that?" and Investigator Terry said, "No." Mr. Maples also expressed concern with Investigator Terry putting his name on any paperwork.

E. <u>Other Witnesses' Trial Testimony</u>. Akeem testified that he called 9-1-1 immediately after the shooting stopped. He testified that he "was scared for [his] life" and that it was the first time he had "ever witness[ed] anything like that." Akeem noticed that Ms. Brown appeared to be seriously injured while he was dialing 9-1-1.

Akeem went to speak with the officers when they arrived on the scene "telling them who did it and all[.]" Akeem described that, during this time, Mr. Maples "came back outside" and "was freaking out" because he realized that Ms. Brown had been shot. Akeem also saw his sister who was visibly upset.

Akeem identified the driver of the Camry as "kind of like mixed, like Mexican looking guy." According to Akeem, he saw this man around 2:00 p.m. the day before while he was standing outside 1605 Moses. When Akeem was asked who lived at 1605 Moses, he responded, "Braxton, [the Defendant], the Mexican looking guy and his brother Bronson."

Akeem also testified that he had seen the Defendant in the Camry earlier that day. When asked if the Defendant looked "anything" like his younger brother Daquawn, Akeem replied, "Not—kind of, but not really." Furthermore, according to Akeem, Daquawn had "dreadlocks" back then, and the Defendant's hair was short.

On cross-examination, Akeem averred that only he, his sister, Ms. Brown, and Mr. Maples were at the residence when the shooting occurred and, specifically, that neither Mr. Dixson nor Mr. Andrews were present. Akeem said that he had been there talking with Ms. Brown and Mr. Maples for some time. Akeem maintained that he was unarmed.

According to Akeem, his sister had only arrived shortly before the shooting, and after her arrival, she instructed Mr. Maples to take the twins inside because it was getting hot. Jasmine also "started telling [them] that Daquawn had got [sic] robbed and he thought . . . that [Akeem] had something to do with it[.]" Akeem denied being involved in Daquawn's robbery. Akeem said that the Defendant "came around the corner" and opened fire.

Jasmine Hollingsworth also testified, relaying much of the same information as her brother, including that the driver of the Camry was "Mexican," that Mr. Maples "came running out of the house saying" Ms. Brown had been "hit," that Ms. Brown appeared to be gravely injured, and that they were all "going crazy" from these events. Jasmine recollected that Mr. Maples was in the house when the shooting started. Jasmine further stated that she was scared and "didn't like . . . being in that situation."

On cross-examination, Jasmine stated that she "stopped by" 1605 Moses before she went to the Brown-Maples residence and that Blair Williams told her about Daquawn's robbery, although she never provided specific details. According to Jasmine, Blair had come out of the house and "was talking off the balcony." Furthermore, Jasmine denied telling anyone at the Brown-Maples residence "that the guys at 1605 were coming down to shoot[.]"

On recross, Jasmine viewed a portion of her police station interview to refresh her recollection, and the video recording was also played for the jury.[8] Jasmine then recalled that she spoke on the porch of 1605 Moses with Blair Williams, the Defendant, and the Defendant's "Mexican" brother, and that a gun was exchanged on the porch. Also, Jasmine agreed that she said during the interview "that this was all on that Little Boy" and that Daquawn was robbed of $1500. Jasmine denied ever calling Mr. Maples after leaving 1605 Moses.

Shawn Matson lived on Brookside Avenue behind Nolan Avenue. On June 7, 2013, he was in his backyard when he heard twenty-eight to thirty shots coming from an AK-47. Mr. Matson further relayed, "And then I heard probably three or four more shots in the middle of all that going on," which he said sounded different "like an M-80 or something going off[,] . . . [l]ike a firecracker." Shortly after the shooting, Mr. Matson saw a green Toyota Camry drive by his residence. According to Mr. Matson, the passenger was "hanging out the window" and pretending to make "the noise that the gun was making just three seconds prior to that." Mr. Matson explained that the man, whom he described as "slender-built" African-American with "short hair at the top" and "wearing a black t-shirt," was pointing at him and mimicking "[p]ow, pow, pow." Furthermore, Mr. Matson depicted the driver of the car as "light-skinned[,]" possibly "Hispanic" maybe "mixed[,]" and "heavy built," with "some tattoos." However, Mr. Matson also said that his view was limited because he "was on the other side of the car."

Mr. Matson went to 1430 Nolan to offer assistance, and he started administering CPR to Ms. Brown. He observed Ms. Brown's boyfriend and another male and female

---

[8] The record reveals that the video was accompanied by a transcript. However, it appears that neither was entered as an exhibit and are, therefore, not a part of the appellate record.

present. Mr. Matson described them as "[h]ysterical, screaming, crying." He had never met any of these individuals prior to this time.

Tony Brown also lived on Brookside Avenue and heard "a whole bunch of gunshots" the morning of June 7, 2013. He testified that he ran to his backyard and saw "like green, maybe a dark-colored car coming" up the street before it turned. He further described it as a "small car like a Honda, Toyota, something like that." Mr. Brown was able to identify the driver of the car as "dark-headed, had some facial, tattoos, kind of a . . . like dark-skinned, but he wasn't black or he wasn't Hispanic[,] . . . like a good tan[.]" He was unable to get a good look at the passenger of the vehicle. According to Mr. Brown, the car "was moving faster than it should." After the car turned, Mr. Brown observed a man hollering "help me, help me, they've killed her, they've killed her[.]" He thought the man was the victim's husband or boyfriend and said that "the guy was running crazy." Mr. Brown had never met any of these individuals prior to this incident.

Whitney Berry testified that she knew the Defendant "from the neighborhood," and the night before the shooting, she talked with the Defendant and Mr. O'Neill in a parking lot in "Western Heights right across from the Baptist Center[.]" She had never met Mr. O'Neill before. According to Ms. Berry, on this occasion, the Defendant received a phone call from his brother saying that he had just been robbed, and she heard the Defendant's telling his brother "where some guns were" located in a closet.

Rosevelt Malone testified that he was arrested on June 7, 2013, for failure to appear and that, on that day, he was transported, along with the Defendant and others, "in a wagon that was being driven by Knoxville Police Department officers[.]" According to Mr. Malone, he overheard the Defendant say, "[T]hey don't have anything on us, stick with your story." He also heard the Defendant admit to "[c]leaning his self off" with alcohol to remove any "gunpowder" and to "hiding out" from police.

At trial, Investigator Booker described the Defendant as "nonchalant" during the recorded interview. According to Investigator Booker, the Defendant became "aggravated" when Investigator Booker did not believe the Defendant's story. Investigator Booker also found it "as very odd" that the Defendant asked about the gun during the interview, "almost like he knew we didn't have the gun."

Investigator Booker also interviewed Mr. O'Neill. When Mr. O'Neill was told that he was getting charged with murder, his "response was literally 'okay.'" Like the Defendant, Mr. O'Neill told Investigator Booker that they had been at 1605 Moses that morning and had not left. Investigator Booker confirmed that the Defendant and Mr. O'Neill were transported together "in a wagon" after questioning.

In addition, because of information provided by Mr. Maples during his interview, Investigator Booker "learned of two more people that may have possibly been at the scene," Mr. Dixson and Mr. Andrews. Investigator Booker then spoke with both Mr. Dixson and Mr. Andrews, but neither of them admitted to being present during the shooting. Investigator Booker determined that the red Buick in the driveway of the Brown-Maples residence belonged to Mr. Dixson. Mr. Dixson admitted to regularly staying with Mr. Maples and Ms. Brown.

Investigator Booker discovered that Mr. Andrews's aunt lived at the residence next-door to Ms. Brown at 1428 Nolan Avenue. Investigator Booker confirmed that, during a 9-1-1 call following the shooting, a female said that she "saw someone carrying a gun from the scene of the shooting." Mr. Maples admitted to hiding an SKS rifle at Mr. Andrews's aunt's house before the police arrived. Investigator Booker also spoke with Ms. Brown's other neighbor at 1434 Nolan Avenue. That neighbor "had nothing but praise for [Ms. Brown]." However, he also told Investigator Booker that "[Mr. Maples] ran with a bad group of folks, and he said there's actually been shootings there at the house before." According to Investigator Booker, shootings occurred somewhat often in this area of Knoxville, and it was not that unusual to find ballistic evidence at a scene that was possibly related to another crime.

Investigator Booker also testified that he had received a call from Daquawn on June 7, prior to the shooting, during which Daquawn reported that he had been robbed at approximately 3:00 a.m. that morning. According to Investigator Booker, Daquawn did not provide the name of his assailants. When Investigator Booker contacted Daquawn after the shooting, Daquawn was "stunned" by news of the shooting, but he refused to speak with Investigator Booker further.

F. Autopsy and Forensics. Medical examiner Dr. Darinka Mileusnic-Polchan performed Ms. Brown's autopsy and determined that Ms. Brown died as a result of an "atypical[,] large" gunshot wound to the back. Dr. Mileusnic-Polchan described the path of the bullet:

> [T]he entrance was on the left back area toward the side and then entered the left chest where it affected the lung, it crossed the midline going upward, it affected the vessels in the neck region, actually, also nicked the aorta, and that's where major bleeding was coming from, and then as it . . . transferred toward the right side of the body, affected the thyroid gland, and then the bullet was lodged in the right side of the neck.

Dr. Mileusnic-Polchan described that the "overall trajectory" of the bullet "was from back to front, left to right, and upward," and it "affect[ed] all the major organs along its path[.]" Furthermore, "as the bullet actually fractured one of [Ms. Brown's] ribs," it

"pretty much fragmented[,]" which led Dr. Mileusnic-Polchan "to believe that there was some intermediate target" before the bullet reached Ms. Brown. Dr. Mileusnic-Polchan was also able to determine that Ms. Brown was "leaning forward" when she was shot.

KPD firearms examiner Patricia Ann Resig was given four "small lead fragments" and "one metal fragment" taken from Ms. Brown's body to examine. According to Officer Resig, the four lead fragments were "recovered from the right neck, the right bronchus and mediastinum of" Ms. Brown. The metal fragment was "recovered from the left arm of" Ms. Brown. However, these fragments did not have any "class characteristics or individual characteristics" that would allow Officer Resig "to say whether [they] came from a specific gun, or whether or not it was, in fact, bullet material."

The Defendant's Camry was examined once at the police impound lot, and no bullet damage was observed. Also, several of the Defendant's identification cards were found inside. Five fingerprints were "lifted" from the Camry—four belonged to the Defendant and one to Braxton Williams.

The gunshot residue test performed on the Defendant was inconclusive. That meant that the results could not "eliminate the possibility that the [Defendant] could have fired, handled or was near a gun, if fired but they [were] inconclusive."

G. Defense Proof. Mr. O'Neill was recalled and testified that he anticipated a plea deal from the State in light of his testimony against the Defendant. There was no specific deal in place, but Mr. O'Neill hoped for a "facilitation" charge and a sentence somewhere between fifteen and twenty-five years.

The Defendant testified on his own behalf. He stated that he lived "on the south side" of Knoxville, although he could not remember the exact address. According to the Defendant, he had lived in Knoxville, "[o]n and [off], all [his] life." The Defendant testified that "[his] brothers" were in town on June 6, 2013, that he went over to 1605 Moses to visit with them that day, and that he returned to his residence that evening accompanied by Mr. O'Neill.

The Defendant stated that he received a telephone call the following morning on June 7, informing him that his brother had been robbed. The Defendant claimed that he went to the Brown-Maples residence first because that was where he had last seen Daquawn. When Daquawn was not there, the Defendant then proceeded to 1605 Moses where he found his brother. According to the Defendant, Daquawn told him that Mr. Dixson, Akeem Hollingsworth, and "Quanlo" (a nickname for Mr. Andrews) robbed him and made him strip down to his underwear. The Defendant also testified that Jasmine overheard the details of the robbery.

-14-

The Defendant got angry and retrieved the AK-47 from inside the house. According to the Defendant, he was tired of other people "picking with" his little brother because Daquawn was "little" and "gay." The Defendant claimed that he got in the green Camry by himself and went to the Brown-Maples residence only to retrieve the stolen money and did not intend to kill anyone. When the Defendant arrived, he saw Mr. Maples in the driveway, and Mr. Maples said, "What's up?" The Defendant maintained that, when he did not see the people he was looking for at the Brown-Maples residence, he returned to 1605 Moses and put the gun back.

Thereafter, Jasmine called from the Brown-Maples residence, and the Defendant could tell that "[t]here was a lot of people in the background." The Defendant acknowledged that he retrieved the gun once again and that Mr. O'Neill drove him to the Brown-Maples residence—1430 Nolan. The Defendant testified that he instructed Mr. O'Neill to stop in front of the driveway. As the Defendant was attempting to get out of the car, the Defendant saw "a white shirt come out of nowhere and a gun was pointing at [him]." He explained that he saw an African-American man wearing a white shirt "[i]n the yard." The Defendant then grabbed his gun off the floorboard and yelled at Mr. O'Neill to drive away; however, Mr. O'Neill accidentally put the car in neutral for a moment before getting the car in gear. The Defendant testified that, as Mr. O'Neill began driving, the Defendant started shooting towards the man with the gun. The Defendant could not say for certain whether the man in the white shirt fired at him, although he "believe[d] he did."

The Defendant confirmed that, following the shooting, he and Mr. O'Neill returned to 1605 Moses and hid from the police. The Defendant claimed that he put the AK-47 "in the next-door room" to where he was hiding and did not know its ultimate fate.

On cross-examination, the Defendant acknowledged that this was the first time he had ever provided this version of the events to anyone. The Defendant admitted that he saw people "all around" the Brown-Maples residence and conceded that the bullet the killed Ms. Brown "must" have come from his gun. The Defendant stated that he knew there was an SKS rifle at the Brown-Maples residence, having seen it during a prior visit, and that was why he got the AK-47 before going over there. According to the Defendant, he went into 1605 Moses by himself to retrieve the AK-47. When asked if he "knew where the gun was[,]" he replied that he did not, but he "went in there to the last place [he] saw it." He claimed that, when he went inside, "it was just right there" "by the stairwell" on the main floor.

The Defendant denied that he ever made any hand gestures, like "[p]ow, pow, pow," towards Mr. Matson as he drove by him. The Defendant also denied that he said any of the things Mr. Malone claimed to have overheard while they were being

-15-

transported "in a wagon" together. The Defendant averred that he made no efforts to clean the gunshot residue off his hands. He also said that he took his shirt off after the shooting because he was "hot," not because he was attempting to dispose of evidence. Finally, the Defendant agreed that the Hollingsworth siblings were legitimately "surprised" by the shooting and were not faking their reactions.

On redirect, the Defendant confirmed that "every single thing" he told Investigator Booker during the interview was a lie and that Investigator Booker told him "early in the interview" that he was going to be charged with first degree murder. The Defendant also said that Daquawn asserted that he would go to jail if he showed up in court without his money.

H. Verdict and Sentencing. The jury found the Defendant guilty as charged of first degree premeditated murder and two counts of aggravated assault involving the Hollingsworth siblings. The Defendant was sentenced to life imprisonment for the murder conviction and to concurrent three-year sentences for the aggravated assault convictions. The Defendant filed a timely notice of appeal.

ANALYSIS

On appeal, the Defendant contends (1) that he was deprived of his right to present a viable defense when the trial court permitted Mr. Maples to assert the privilege against self-incrimination and, thereafter, refused to allow defense counsel to withdraw so that defense counsel could testify about Mr. Maples' past statements; (2) that his motion to dismiss the indictment should have been granted after the State failed to preserve exculpatory evidence in the form of Mr. Maples' testimony; (3) that the trial court erred by failing to suppress his statement to police given evidence that the Defendant suffered a brain injury causing intellectual impairment, that the Defendant invoked his right to counsel, and that the Defendant did not voluntarily waive his Miranda rights; (4) that the trial court improperly permitted the State to introduce numerous photographs of weapons and ammunition found during the search of the home where the Defendant was apprehended—1605 Moses; (5) that the evidence was insufficient to support his convictions because the State failed to prove that the Defendant was the one who fired the shot that killed Ms. Brown or that he acted with premeditation; and (6) that a jury instruction on diminished capacity was warranted by the proof. We will address the Defendant's issues in turn.

I. *Charles Maples' Statements*

The Defendant raises multiple issues on appeal with regard to statements made by Mr. Maples—alleging that he was deprived of his right to present a viable defense when the trial court allowed Mr. Maples to invoke the privilege against self-incrimination,

-16-

when the trial court denied defense counsels' motion to withdraw, and when the trial court denied his motion to dismiss the indictment due to the State's failure to preserve exculpatory evidence. However, we agree with the State that all of the Defendant's issues in this regard are waived due to various deficits.

## A. *Procedural History*

These issues were addressed in a hearing held on May 7, 2015. The trial court's statements at the outset of the hearing clearly indicate that these matters had been discussed at previous hearings—"We are back . . . on our continuing hearing concerning the motions pending before the [c]ourt"; and "We have heard a lot of argument on this case[.]" The trial court then addressed defense counsels' motion to withdraw[9] and stated that the first order of business was to see if Mr. Maples was refusing to testify.

Mr. Maples was called to the stand. The trial court questioned Mr. Maples as follows:

> THE COURT: . . . Now, the parties have subpoenaed you to testify in this case . . . . Are you prepared to give testimony about what happened on [June 7, 2013]?
>
> [MR. MAPLES]: No, your Honor.
>
> THE COURT: All right. Can you tell me why you wish not to testify?
>
> [MR. MAPLES]: I'm asserting my Fifth Amendment right.
>
> THE COURT: 'Cause you believe this may incriminate you; is that right?
>
> [MR. MAPLES]: No, your Honor.
>
> THE COURT: That's what I'm saying is that's what the Fifth Amendment means.
>
> [MR. MAPLES]: Oh, yes. Yes.

---

[9] Both District Public Defender Stephens and Assistant Public Defender Lutton were seeking to withdraw from representing the Defendant and were thus present at the hearing. Assistant Public Defender Harwell was present as well.

THE COURT: Is that you believe that you might say something that may incriminate you, and so is that what you're saying is that you're afraid if you testify about this that what you say could incriminate you? Is that what you're telling me?

[MR. MAPLES]: I mean, yes.

THE COURT: Okay. All right. Now, the other thing I need to ask you, has anybody threatened you or coerced you not to testify in this case?

[MR. MAPLES]: No, your Honor.

THE COURT: Okay. All right. General, you may not ask him any questions about what happened that day, but do you have any questions concerning his willingness to testify?

[PROSECUTOR]: No, your Honor.

THE COURT: All right. [Defense counsel], do you have any questions concerning his willingness to testify?

[DEFENSE COUNSEL]: No, your Honor.

The trial court then noted its familiarity with the parties' arguments on the motion to withdraw but nonetheless inquired if defense counsel wished to put forth any additional argument based upon Mr. Maples' testimony. Defense counsel replied, "I think we just want to make sure that the testimony that was entered previously is part of this record of this hearing as well." Defense counsel then clarified that he was referring to his own prior testimony.[10] Defense counsel continued, "This was a continuation of the prior hearing . . . and so we just want to make sure that everything that was argued about previously . . . and the prior testimony is part of this record[.]" The trial court responded affirmatively to the request. The State, when asked, likewise did not desire to argue the issue any further. The trial court reiterated that "extensive arguments" on the motion had taken place and that it would be taking the matter under advisement before issuing a written order. Thereafter, defense counsel summarized the claims presented in the motion to withdraw: "[M]ost of the issue relating to withdrawal has to do with [defense counsel] as witnesses as to what Mr. Maples told them. There was one other instance in which [defense counsel] were speaking with Mr. Dix[s]on. . . . And Mr. Dix[s]on directly issued a threat for Mr. Maples through [defense counsel.]"

---

[10] Assistant Public Defender Lutton was speaking at this time.

-18-

Mr. Dixson also testified at this hearing. According to Mr. Dixson, although defense counsel had approached him about the Defendant's case, he refused to answer their questions and asked for a lawyer. Mr. Dixson denied telling defense counsel to pass a message to Mr. Maples "that he knows what he's got coming to him."

Mr. Dixson acknowledged that, on two occasions, he was transported from the Department of Correction penal facility to the Knox County Jail along with Mr. Maples. Mr. Dixson stated that he sat next to Mr. Maples, whom he had known as a friend for many years, both times on the bus. However, Mr. Dixson asserted that he never threatened Mr. Maples "that he better not testify" in the Defendant's case.

Furthermore, Mr. Dixson denied having any knowledge that he had been placed at the scene of the shooting. According to Mr. Dixson, the Defendant showed him witness statements while they were incarcerated together, and he did not assault the Defendant "in order to get that paperwork."

Defense counsel then stated that "the only way the defense could present the fact" that Mr. Dixson threatened Mr. Maples through defense counsel was for defense counsel to testify at the Defendant's trial. Defense counsel asserted, "Mr. Dix[s]on is obviously concerned that somebody's going to come to trial and say something adverse to him, and he is trying to silence that from happening[.]"

Regarding the Ferguson motion, the trial court noted, "[W]e've heard some argument on that, but maybe, perhaps not quite as much as the other." Defense counsel asserted that Mr. Maples had provided favorable information to the defense during questioning and that Mr. Maples was willing to testify at the Defendant's trial. However, despite defense counsels' efforts that Mr. Maples and Mr. Dixson not be transported or incarcerated together, they were, and Mr. Dixson was able to threaten Mr. Maples. The defense reasoned that, because Mr. Maples was no longer willing to testify due to Mr. Dixson's threats, the State had violated Ferguson by destroying exculpatory evidence and the appropriate remedy was dismissal of the indictment.

Regarding the separation of Mr. Maples and Mr. Dixson, the prosecutor said that she had no recollection of "a request to make sure an incompatibility order be issued coming across [her] desk." Nonetheless, the prosecutor stated that she was offering to "enter into a stipulation regarding Mr. Maples' testimony." She explained, "In my mind that means that we sit down and we map out a stipulation as I have done in many cases, and that would include not just what Mr. Maples said to the police, but also what he said to the defense and what he has told me about this case." The trial court stated, "So . . . if there are going [to] be stipulations in this case, y'all are just going to have to get together and agree that that's what was said." The prosecutor continued,

I mean, what other . . . defense strategy do they need? They've got a witness, Mr. Maples, who said it was some other guy who shot and that he was afraid that people from his house shot back. . . . I'm telling the [c]ourt that that exculpatory information . . . is something I'm willing to stipulate to.

Because no stipulation had yet been agreed to, the trial court stated that it would issue written orders on the motions as soon as possible, so the case would continue to trial. Additionally, defense counsel noted that the transcript of the hearing "the time we were here before" had been ordered. The trial court stated that it had not received the transcript but had "pretty decent notes on that."

Subsequently, the trial court denied the motions to withdraw and dismiss the indictment by written orders. Regarding the motion to withdraw, the trial court concluded, "[T]he court finds that Mr. Maples' and Mr. Dix[s]on's previous statements to counsel are inadmissible under the rules of evidence, and exclusion of said statements does not offend due process." In making this conclusion, the trial court determined that "stated threat by Mr. Dix[s]on" was not "critical to the defense." In denying the Defendant's motion to dismiss the indictment, the trial court made the following conclusions: "The State has not lost or destroyed evidence. The evidence still exists in the form in which it was collected. The State has not caused the witness Charles Maples to assert his privilege against self-incrimination. The State is not responsible for the inadmissibility of Mr. Maples' out-of-court statements."

Despite the trial court's ruling, the State was still willing to enter into an agreed-upon stipulation. Just prior to picking the jury on May 11, 2015, defense counsel stated, "We are still working toward a stipulation regarding Charles Maples, we are really close. There's still a few points that are sort of dangling out there." The prosecutor clarified, "[S]o the stipulation would be what we expect his testimony to be, not that all these things are true."

Trial began on May 12. Just prior to opening arguments, defense counsel maintained that they were "still trying to work out this stipulation." Defense counsel then stated that he had spoken with the Board of Professional Responsibility about any ethical concerns and was ready to agree to the proposed terms of the stipulation. The prosecutor summarized the agreement for the record:

With regard to the stipulation of Mr. Maples' testimony, Mr. Maples has spoken to a number of people on a number of occasions, so what we agree to do is to agree that he has made statements, and we're not going to

identify whether the statements were made to [d]efense counsel or to me.[11] Obviously, one is made on a video to a police officer, another is a recorded statement that . . . we've agreed to play that he gave to police. And we're just going to refer to the fact that he's made other statements.

. . . .

And then at some point . . . we're going to reduce this to writing. At some point, we're going to read the stipulation to the jury. We'[v]e got his statement that will be played, . . . and then we're gonna have a written document that's gonna contain additional things that he said in interviews.

The trial court asked the Defendant if he had any objection to the proposed stipulation. The Defendant responded in the negative. The jury was then brought into the courtroom, and trial began.

## B. *Privilege Against Self-Incrimination*

First, the Defendant argues that "Charles Maples was not entitled to the privilege against self-incrimination." According to the Defendant, "Mr. Maples asserted the privilege against self-incrimination only as a pretext to evade testifying at [the Defendant's] trial"; "[i]nstead, Mr. Maples' concern was that his testimony would incriminate *Tony Dix[s]on*, who would then, retaliate against him either personally or through another member of Rollin Crips gang." The Defendant relies on Ohio v. Reiner, 532 U.S. 17, 21 (2001), which holds that the Fifth Amendment privilege "extends only to witnesses who have reasonable cause to apprehend a danger from a direct answer[,]" to support his contention that "Mr. Maples *did not* have a 'reasonable cause to apprehend danger' of self-incrimination from his potential trial testimony." The Defendant also maintains that "the privilege against self-incrimination may *not* be used as a shield for protection of a third person from criminal prosecution."

Then, ostensibly raising some sort of procedural objection, the Defendant argues that the trial court erred by precluding defense counsel from asking "questions regarding the events of the shooting on June 7, 2013, which in turn, resulted in an unjust limitation of [the Defendant's] constitutional right to present a defense and to impeach witnesses against him." The Defendant next seemingly acknowledges that plenary review of the issue is waived by his citations to Tennessee Rule of Appellate Procedure 36(b), delineating the plain error doctrine, and to State v. Adkisson, 899 S.W.2d 626 (Tenn. Crim. App. 1994), setting forth the standard to be employed for plain error review.

---

[11] According to defense counsel, the Board Professional Responsibility had opined that it must be done this way in order to avoid any ethical concerns.

Relying on these citations, the Defendant asserts that "the trial court's failure to conduct any meaningful inquiry into Mr. Maples' true reasons to invoke the right to remain silent was plain on its face, and was so prejudicial to [the Defendant's] constitutional right to present a viable defense, as to result in a fundamental unfairness of his trial as a whole."

## C. *Defense Counsel's Motion to Withdraw*

Second, the Defendant submits that "the denial of [defense] counsel[s'] motion to withdraw violated the holding in State v. Brown[, 29 S.W.3d 427 (Tenn. 2000)]." In Brown, the defendant appealed the trial court's denial of his motion to present hearsay evidence of the minor victim's prior sexual behavior with another male "to provide the jury with an alternative explanation" for the tear in the victim's hymen. 29 S.W.3d at 429. The court first observed that the evidence was "clearly relevant to rebut the State's medical proof . . . and met the threshold admissibility standard of Tennessee Rule of Evidence 412." Id. at 434. The court then concluded that, despite the rule against hearsay, the evidence should have been admitted "to satisfy [the defendant's] constitutional right to present a defense." Id. at 436.

Specifically, the Defendant claims that the exclusion of the statements made by Mr. Maples to defense counsel violated his right to present a defense despite the hearsay nature of the statements. According to the Defendant, "the record in this case was fraught with evidence corroborating Mr. Maples' statement on June 13, 2013, and . . . the court itself found credible the defense account of threats to Mr. Maples by Tony Dix[s]on." Thus, the trial court should have granted defense counsels' motion to withdraw, in the Defendant's opinion.

## D. *Motion to Dismiss Indictment*

In this same vein, the Defendant contends that the trial court's denial of his "motion to dismiss the indictment violated his right to present [a] defense and conflicted with the holding in State v. Ferguson[, 2 S.W.3d 912 (Tenn. 1999)]." Ferguson governs claims regarding the State's duty to preserve potentially exculpatory evidence. Under Ferguson, the primary inquiry is "[w]hether a trial, conducted without the destroyed evidence, would be fundamentally fair[.]" 2 S.W.3d at 914. First, we must consider whether the State had a duty to preserve the evidence in issue. Id. at 917. "Generally speaking, the State has a duty to preserve all evidence subject to discovery and inspection under Tennessee Rule of Criminal Procedure 16, or other applicable law." Id. (footnote omitted). The analysis under Ferguson is only triggered, however, if the alleged exculpatory evidence is determined to be material:

> Whatever duty the Constitution imposes on the States to preserve evidence,
> that duty must be limited to evidence that might be expected to play a

-22-

significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

Id. (quoting California v. Trombetta, 467 U.S. 479, 488-89 (1984)).

The Defendant recounts that Mr. Maples and Tony Dixson were transported together from jail, although previous instructions had been given to the Department of Correction not to do so, and the two men were housed in neighboring cells at the Knox County Detention Facility upon their arrival. The Defendant extrapolates that, because the State provided Tony Dixson with the opportunity to threaten Mr. Maples, because Mr. Maples thereafter invoked his privilege against self-incrimination based upon Mr. Dixson's threats, and because the Defendant was unable to obtain comparable evidence by other means, the State failed "preserve evidence of constitutional materiality to [the Defendant's] right to present a defense and to impeach the State's witnesses" in the form of Mr. Maples' testimony at trial. Accordingly, the Defendant asserts that his indictment must be dismissed pursuant to Ferguson.[12]

### E. *Motion for New Trial*

At the motion for new trial hearing, the defense again argued that the trial court's denying of the motion to dismiss the indictment and the motion to withdraw impaired the Defendant's right to present a defense "in a couple of ways." Initially, the defense acknowledged that "[t]here was a stipulation that was reached by the parties that provided some of the information that Mr. Maples had told to [defense counsel], including that Mr. Di[x]son had been in the house with a gun[.]" However, the defense argued that this was not a complete stipulation because the stipulation did not provide (1) that "Mr. Maples had seen Mr. Di[x]son leave the house with a gun and that Mr. Maples believed that Mr. Di[x]son had fired that gun," (2) that Mr. Dixson indicated to defense counsel "that he was aware that Charles Maples was going to put him at the scene and that [Mr. Dixson] wanted to communicate through [defense counsel] to Mr. Maples that Mr. Maples should know what was coming to him," or (3) that Mr. Maples told defense counsel that Mr. Dixson had threatened him directly. Ultimately, the trial court denied the Defendant's motion for new trial.

---

[12] We feel compelled to note that the Defendant, in making these conclusions, points to excerpts of Mr. Maples' statement to the police on June 13, 2013, as establishing a viable defense, but he then maintains that Mr. Maples' statement to the police "was of no evidentiary value to [the Defendant's] right to present a defense at trial" because that statement was inadmissible. This ignores the fact that the statement was indeed admitted at trial.

## F. *Waiver Analysis*

As stated above, the Defendant's issues surrounding Mr. Maples' trial testimony are waived for a plethora of reasons. First, despite the numerous statements that these matters had been discussed in depth prior to the May 7, 2015 hearing, there is no transcript(s) in the record covering any earlier discussions on these topics. For example, defense counsel's, Mr. Lutton, previous "testimony" is not a part of the record. Moreover, while there is an abundance of factual background concerning these issues in the Defendant's motion for new trial, none of those facts are apparent from the proceedings in the trial court that are a part of the appellate record. The fact that Mr. Maples told defense counsel that Mr. Dixson had threatened him directly was not referenced anywhere in the record before this court until the motion for new trial hearing. It is the Defendant's duty to prepare a record that conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of the appeal." Tenn. R. App. P. 24(b).

Second, defense counsel never challenged Mr. Maples' invocation of his Fifth Amendment privilege or the trial court's ruling forbidding questions about the shooting. In fact, defense counsel did not ask any questions of Mr. Maples at all. See Tenn. R. App. P. 36(a) (stating that relief is not required if the party seeking it "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of the error"). "The failure to make a contemporaneous objection constitute[s] waiver of the issue on appeal." State v. Gilley, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008). Moreover, this specific issue about Mr. Maples' invocation of his Fifth Amendment privilege was not raised in the Defendant's motion for a new trial.[13] Tennessee Rule of Appellate Procedure 3(e) treats issues "upon which a new trial is sought" as waived "unless the same was specifically stated in a motion for a new trial."[14] Issues cannot be raised for the first time on appeal. See State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996).

Most importantly, the State and the Defendant entered into an agreed stipulation that Mr. Maples was unavailable and that the stipulation contained the trial testimony of Mr. Maples had he been available. Mr. Maples' declarations in the stipulation purportedly contained many of the statements he had made to outside parties, and it was purposefully not specified in the stipulation to whom Mr. Maples was speaking to each time. Mr. Maples' redacted statement given to the police on June 13, 2013, was also

---

[13] Mr. Dixson's assertion of his Fifth Amendment privilege, not Mr. Maples', was raised as an issue.

[14] We note that the motion to dismiss and the motion to withdraw issues were preserved in the Defendant's motion for new trial.

introduced at trial and played for the jury. The jury was told that it could consider the stipulation and Mr. Maples' police interview as substantive evidence. Ultimately, no objection was lodged that the stipulation was incomplete or to the final redaction of Mr. Maples' police interview. See Tenn. R. App. P. 36(a); Gilley, 297 S.W.3d at 762.

The day before trial, defense counsel made statements like: "[W]e are working toward a stipulation regarding Charles Maples, we are really close."; and "We were exchanging e-mails even as late as last night trying to finalize this, so I'm assuming that it'll get finalized before opening statement, but we just wanted to let the [c]ourt know that there's still about four points that we're negotiating on." On the morning of trial before opening statements, defense counsel stated that an agreement had been reached and that a written stipulation would be forthcoming. Ultimately, the written stipulation was read to the jury.

In addition, when Mr. Maples' police interview was first played for the jury, defense counsel noted an objection to the redaction. The prosecutor stated that she had already removed gang references from the recording, but defense counsel asked that the first portion of the interview also be redacted because it included details of "the shooting at Ridgebrook" that may have implicated the Defendant. Defense counsel noted, "If I'm wrong about the reference to [the Defendant], there's no point—now that they've heard it, there's no point in pulling it out now. It'll appear we're hiding something." Subsequently, a second redacted recording removing a portion from the beginning of the of Mr. Maples' interview was played for the jury without objection.

From all appearances at trial, the stipulation and video recording contained all of the statements from Mr. Maples that both sides sought to introduce. It was not until the motion for new trial that the Defendant complained that the stipulation was lacking. Accordingly, these issues are reviewable only for plain error.

The plain error doctrine states that, "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In order for this court to find plain error,

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting Adkisson, 899 S.W.2d at 641-42). "It is the accused's burden to persuade an appellate court that the trial court

committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing United States v. Olano, 507 U.S. 725, 734 (1993)). "[T]he presence of all five factors must be established by the record before this [c]ourt will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283.

Regarding specifics of his argument on appeal, the Defendant claims that the trial court's ruling was in error because "a defendant does not need to present at trial a 'complete defense,' . . . raising a *reasonable doubt*, is all" that is required. The Defendant then points to the "categorical statement of Mr. Maples, who was an eyewitness of the shooting, that [the Defendant] 'did not drop my girlfriend, I know that for fact, well, that's a fact,' . . . as well as [Mr. Maples' account of the events], which placed the armed Tony Dix[s]on, Akeem Hollingsworth, and Shaquan Andrews at the crime scene." Then, the Defendant submits that "Mr. Maples' testimony would have allowed [him] to impeach the credibility of, and to demonstrate bias on the part of the two star witnesses for the State—Jasmine Hollingsworth and her brother Akeem Hollingsworth." According to the Defendant, "[in] this respect, Mr. Maples' statement revealed that Akeem Hollingsworth participated in the robbery of Daquawn Simmons, that Akeem was armed at the time of the shooting, that Akeem was very close with Tony Dixson, and that Jasmine wanted to protect [her] brother Akeem." The Defendant then cites to the transcript of Mr. Maples' video-recorded statement given on June 13, 2013. According to the Defendant, these statements from Mr. Maples "would have sufficed to satisfy" the Defendant's constitutional right to present a defense.

However, all of this evidence was presented to the jury because the video recording was played at trial and entered as an exhibit and the agreed-upon stipulation was read to the jury and admitted as evidence. Mr. Maples' statements did place Mr. Dixson at the scene of the shooting and portrayed that Mr. Dixson was armed with a .45 handgun when he exited the residence. Spent .45 shell casings found in the front yard of the Brown-Maples residence were entered into evidence. Mr. Maples said that it was possible someone besides the Defendant fired the shot that killed Ms. Brown, although Mr. Maples never stated with certainty that he saw Mr. Dixson or anyone else fire a weapon that day. Thus, the Defendant mischaracterizes Mr. Maples' statements relaying his belief that someone else may have shot Ms. Brown as "categorical." Moreover, Mr. Maples never said that Akeem Hollingsworth was involved in the robbery of Daquawn, and Mr. Maples gave conflicting statements about Mr. Andrews' and Akeem's possession of weapons that day. In addition, the jury heard Mr. Maples' various statements about the Hollingsworth siblings, and it was for the jury to assess their credibility. We conclude that the Defendant was able to present his defense to the jury

through Mr. Maples' statements without the possible detriments of questioning him at trial.

Additionally, Mr. Maples testified, under oath, at the May 7, 2015 hearing, that no one had threatened him in an effort to prevent his trial testimony. Furthermore, the trial court found "the stated threat by Mr. Dix[s]on to not be critical to the defense." We agree. In order to determine whether the exclusion of this evidence rises to the level of a constitutional violation, we consider whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important. See Brown, 29 S.W.3d at 433-34 (citing Chambers v. Mississippi, 410 U.S. 284, 298-301). Because exclusion of Mr. Dixson's threats did not significantly undermine any elements of the defense, and in light of the Defendant's additional evidence admitted in support of his defense, we conclude that the excluded testimony was not critical to that defense. See, e.g., State v. Joshua Hunter Bargery, No. W2016-00893-CCA-R3-CD, 2017 WL 4466559, at *43 (Tenn. Crim. App. Oct. 6, 2017) (reaching a similar conclusion). Additionally, the entry of the stipulation and the video recording allowed the Defendant to present his defense without the need for the presentation of defense counsels' hearsay testimony.

None of the five factors necessary for plain error relief are present. The Defendant's issue, as presented, has no merit.

## II. *Motion to Suppress*

The Defendant contends that the trial court should have granted the Defendant's motion to suppress his statement to the Investigators Booker and Wardlaw in light of testimony that the Defendant suffered a brain injury causing intellectual impairment, that the Defendant invoked his right to counsel, and that the Defendant did not voluntarily waive his Miranda rights. The State responds that the trial court properly denied the Defendant's motion.

### A. *Suppression Hearing*

A video recording of the Defendant's interview was admitted as an exhibit to the hearing. At the outset of questioning, the Defendant told Investigator Booker that he had never had his Miranda rights read to him before. Investigator Booker then began to read the Defendant's rights to him. During that process, Investigator Booker advised, "You have the right to consult with a lawyer and have a lawyer present with you while you're being questioned. If you want a lawyer but are unable to pay for one, a lawyer will be appointed to represent you free of any cost to you." The Defendant interjected, "Do you know when is that? . . . You know when is that? . . . When the lawyer can come?" Investigator Booker replied,

When is it?  When . . . the court will have to appoint one to you.  I can't get one for you right now but the court will appoint one for you, alright?  If you decide . . . let me read that one again.  If you want a lawyer but are unable to pay for one, a lawyer will be appointed to represent you free of any cost to you.  If you decide to talk to me without a lawyer present you may stop talking to me at any time.  You also have the right to stop answering at any time until you talk to a lawyer, alright?  This down here is called a waiver, okay?  It says I understand each of my rights and I am willing to make a statement and answer questions without a lawyer present.  No promises or threats have been made to me.  Has anybody threatened you or promised you with anything?

The Defendant then expressed his concern that a female officer had looked down his pants, to which Investigator Booker explained that she was likely looking for a weapon.  Investigator Booker continued, "Alright, I understand each of my rights and I'm willing to make a statement and answer questions without a lawyer present.  No promises or threats have been made to me.  Hearing this you want to talk to me now?"  The Defendant answered, "Yeah, I'm trying to figure out what's going on."  The interview then proceeded for an extended period of time, with multiple officers entering and exiting the room for various investigative reasons.

Investigator Booker testified at the suppression hearing.  According to Investigator Booker, after the Defendant was apprehended at 1605 Moses on June 7, 2013, he was taken to the police station by a patrolman.  Once the Defendant arrived, he was placed in an interview room, and Investigator Booker began to question the Defendant at 2:24 p.m, which was less than three hours after the shooting.  Investigator Booker described the Defendant's demeanor during the interview: "He wasn't angry.  He just seemed kind of, I guess put off in a way . . . to describe his mannerisms.  He just wanted to know what was going on."

Investigator Booker opined that the Defendant appeared to understand his Miranda rights and the questions posed to him during the interview.  However, the Defendant was handcuffed throughout the interview and, therefore, did not sign the waiver of rights form.  Investigator Booker explained:  "He was handcuffed behind his back and due to the gravity of the situation, his charges, I didn't want to uncuff him."  Investigator Booker could not recollect whether he actually showed the Defendant the form or whether Investigator Booker just read from it.

Moreover, Investigator Booker did not have "any reason to think that [the Defendant] wanted to terminate [the] interview . . . or that [the Defendant] was being pressured or threatened or coerced in some way to talk" with him.  The Defendant never conveyed to Investigator Booker that he suffered from any type of mental or physical

-28-

disability or that he had difficulty understanding words or with reading and writing. Investigator Booker also did not believe that the Defendant was intoxicated at the time of the interview.

Neuropsychologist Dr. Peter Young testified that he evaluated the Defendant and opined that the left hemisphere of the Defendant's brain was compromised because the umbilical cord was wrapped around the Defendant's neck at birth. According to Dr. Young, the left hemisphere of one's brain "is predominantly responsible" for language and such things" and also controls the right side of the body. Dr. Young observed that the Defendant also had "motor problems" on his right side, both in the upper and lower extremities. The Defendant also had a separate diagnosis of cerebral palsy.

Dr. Young recalled the Defendant's IQ test results "were variable." He indicated that Defendant's performance on those tests increased over time. Dr. Young also administered the "Halstead-Reitan neuropsychological battery" tests, and the Defendant showed "moderate impairment[,]" which was "indicative of significant problems." According to Dr. Young, "[s]omeone with a moderate impairment would probably not be able to maintain themselves on their own." Dr. Young further explained,

> As someone enters the impaired range, we know there's gonna be problems that are significant, and how well they cope with those, whether they can be a contributing member of society, depends in large measure on how much help they get and how motivated they are to come to grips with those issues.

Dr. Young had reviewed the Defendant's record, and he noted that "early on in [the Defendant's] educational career, people realized he had language problems[,]" but "as [the Defendant] moved along in his educational career, that was not something that was seen as problematic." Dr. Young explained, "[M]ost people who have significant language problems usually learn how to hide and make less obvious their difficulties."

According to Dr. Young, the Defendant tended "to be very aware of subtle social cues" and had "a fairly paranoid stance in life" that caused him not to trust or "feel at ease" with many people. Dr. Young continued, "So, part of that stance then is to pay attention to other people because they might be dangerous."

Dr. Young administered several other tests to the Defendant, which revealed that the Defendant had "moderate to severe impairment" with performing sequential tasks and could not process information quickly. Dr. Young explained that spoken language "comes at us in a . . . relatively continuous stream," and "people who have difficulties with language processing . . . will only get snippets," not the entirety of what is said. Dr. Young agreed that, for someone with language processing issues, their difficulties would

be more pronounced "if a lot of information is thrown at them in a very short period of time[.]" The Defendant also had "problems expressing himself[,]" in Dr. Young's opinion. In addition, the Defendant did "[p]retty poorly" on a test assessing "how well someone can gain new language." Also, the Defendant "had trouble" with the "Token Test[,]" but "[a]lmost anybody who can hear language" performs this test "all right." The Defendant likewise did not do very well on a test measuring abstract thought. Moreover, Dr. Young did not think the Defendant was faking his responses or malingering on any of the tests.

When asked how someone with the Defendant's "particular issues," would "function during an interrogation[,]" Dr. Young responded, "It really depends on the person obviously, but as I said earlier, people who have long term compromises generally find ways to get around those." Dr. Young opined that the Defendant was able to present himself as a "fairly street-smart savvy guy" without revealing his language difficulties and that he was possibly unaware of his deficits. "[I]n a high-stress interaction between two individuals" talking, the Defendant "would be at a disadvantage," according to Dr. Young.

On cross-examination, Dr. Young acknowledged that it was possible "to do poorly on these tests" because of "an inadequate social background," including poverty. During the Defendant's early education years, he was characterized as impulsive and hyperactive with difficulty focusing. The Defendant scored 69 (1997) and 78 (2001) on IQ tests administered by the school system, but when Dr. Young tested him, he scored "much higher[,]" an 87, which was in "the low average range." Dr. Young did say that he was "concerned about the validity of the Defendant's responses on the MMPI-2" test, which was the most commonly used test in psychological forensic evaluations, and that one possible explanation was that the Defendant was faking and another was "inadequate reading ability."

According to Dr. Young, the Defendant's school records indicated that "he was in school sporadically and had a lot of conflict in school." The Defendant was removed from his parents' custody in 2009. The Defendant's records also showed that he had been adjudicated delinquent in juvenile court "of a weapons offense[] and a shooting—aggravated assault[.]" As early as 2008, the Defendant was classified as a "runaway." The Defendant's probation in juvenile court had also been revoked. The Defendant had also tried to get disability benefits and had been denied those.

The trial court asked Dr. Young if he watched the video recording of the Defendant's interview and if he was "able to glean anything from that watching . . . concerning [the Defendant's] ability to understand the questions that were being asked by the investigator." Dr. Young said that he had watched the video and that "[i]t wasn't clear to [him] whether [the Defendant] did or did not understand what was being asked,"

-30-

but that "[it] did seem [the Defendant] was more focused on the female officer['s] having looked in his shorts for weapons, [which] apparently perturbed him."

Dr. Young's report was admitted as an exhibit. Therein, Dr. Young concluded that, to "[m]ost outside observers," Investigator Booker's actions were not "coercive" or "deceptive," but "the issue remains uncertain in light of [the Defendant's] pervasive struggles in apprehending most language."

Regarding the Defendant's ultimate waiver of his Miranda rights, Dr. Young concluded,

> [T]he preponderance of impairments are in [the Defendant's] left hemisphere, as detected in his being diagnosed early in life with cerebral palsy and spastic right hemiplegia. [The Defendant] has been and is significantly compromised cognitively.
>
> Within this context, it is clear that [the Defendant] warrants being seen as unable to knowingly waive his rights, especially in the context of a less than forthright verbal presentation of those rights.

However, in another section of the report, Dr. Young wrote,

> The ultimate question of legal concerns would appear to be whether or not [the Defendant] was able to understand his rights, as were laid out by Investigator Booker in the initial interrogation. The present data cannot answer this question with total certainty. The greatest likelihood is that [the Defendant] did not appreciate fully the nature of his speaking in the interrogation.

## B. *Relevant Law*

The United States and Tennessee Constitutions protect a suspect from "being compelled to give evidence against himself." State v. Berry, 141 S.W.3d 549, 576 (Tenn. 2004) (citing U.S. Const. amend. V; Tenn. Const. art. I, § 9); see also State v. Turner, 305 S.W.3d 508, 515 (Tenn. 2010). When a defendant is in custody and subject to interrogation, the police must first inform him of his Fifth Amendment rights in order for his confession to be admissible as substantive evidence in the trial of the matter. See Miranda v. Arizona, 384 U.S. 436 (1966). Pursuant to Miranda, law enforcement officers are required to warn a person prior to custodial interrogation that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Id. at 479.

A defendant may waive his rights under <u>Miranda</u> if such waiver is voluntary, knowing, and intelligent. <u>State v. Echols</u>, 382 S.W.3d 266, 280 (Tenn. 2012). The State bears the burden of proving by a preponderance of the evidence that the defendant waived his <u>Miranda</u> rights. <u>State v. Climer</u>, 400 S.W.3d 537, 564 (Tenn. 2013) (quoting <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 384 (2010)). Certain factors apply in the determination of whether a waiver of <u>Miranda</u> rights qualifies as voluntary, knowing, and intelligent: the age and background of the defendant; his education and intelligence level; his reading and writing skills; his demeanor and responsiveness to questions; his prior experience with the police; any mental disease or disorder; any intoxication at the time of the waiver; and the manner, detail, and language in which the <u>Miranda</u> rights were explained. <u>Echols</u>, 382 S.W.3d at 280-81 (citing <u>State v. Blackstock</u>, 19 S.W.3d 200, 208 (Tenn. 2000); <u>State v. Callahan</u>, 979 S.W.2d 577, 583 (Tenn. 1998)).

Furthermore, the United States Supreme Court generally stated in <u>Miranda</u> that the right to counsel is invoked when an individual "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking[.]" 384 U.S. at 444-45. However, eight years later in <u>Davis v. United States</u>, the United States Supreme Court adopted a significantly narrower standard for invoking a right to counsel under the Fifth Amendment when it held that "[i]nvocation of the <u>Miranda</u> right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" 512 U.S. 452, 458-59 (1994) (quoting <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 178 (1991)).

"When a suspect invokes the right to counsel, police must cease questioning until counsel is present" or the suspect initiates further conversation with the police. <u>State v. Saylor</u>, 117 S.W.3d 239, 246 (Tenn. 2003) (citing <u>Miranda</u>, 384 U.S. at 444-45; <u>Edwards v. Arizona</u>, 451 U.S. 477 (1981); <u>State v. Stephenson</u>, 878 S.W.2d 530, 548 (Tenn. 1994)). Once the suspect invokes his right to counsel, any later statement made by a defendant as a consequence of interrogation by police must be suppressed. <u>Edwards</u>, 451 U.S. at 487.

The issue of whether a suspect's request for an attorney was unequivocal is a mixed question of law and fact that is subject to de novo review. <u>Climer</u>, 400 S.W.3d 537, 556 (Tenn. 2013) (citing <u>Turner</u>, 305 S.W.3d 508, 514-15 (Tenn. 2010)). In <u>Davis</u>, the Supreme Court stated that, although it is a good policy for law enforcement to clarify whether a suspect has actually asked for an attorney when the suspect's request is ambiguous, it "decline[d] to adopt a rule requiring officers to ask clarifying questions." <u>Davis</u>, 512 U.S. at 461. The Court explained, "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." <u>Id.</u> at 461-62. <u>Accord Saylor</u>, 117 S.W.3d at 246 ("The standard for a

valid invocation of the right to counsel is the same under both [a]rticle I, [s]ection 9 [of the Tennessee Constitution] and the Fifth Amendment.").

## C. *Standard of Review and the Trial Court's Ruling*

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. Conversely, a trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Id.

Here, the trial court determined that the Defendant did not unequivocally invoke his right to counsel and that the Defendant knowingly, voluntarily, and intelligently waived his right against self-incrimination and gave a statement to Investigator Booker, despite Dr. Young's testimony regarding the Defendant's intellectual impairment. In its order denying the Defendant's motion to suppress, the trial court made extensive findings of fact and conclusion of law.

Initially, the trial court provided its "findings of fact":

[I]t is clear from the record that the defendant had been arrested on multiple occasions in the past as a juvenile and had appeared in juvenile court on delinquent charges. . . .

. . . Throughout the interview, the defendant appeared to understand the questions being asked and responded intelligently to them. In fact, the defendant attempted to glean information about the charges and any evidence against him from the officer. He maintained his innocence. The court finds Investigator Booker to be both candid and credible in his testimony.

. . . .

. . . [Dr. Young's] report, which the State does not contest in general, reveals that the [D]efendant has suffered psychological effects upon the portion of the brain controlling his capacity for language, memory, and

-33-

concentration. It is possible that this organic condition has also affected his mental and emotional condition. In his opinion, this warrants that [the Defendant] should be "seen as unable to knowingly waive his rights, especially in the context of a less than forthright verbal presentation of those rights." . . .

The court finds Dr. Young's testimony credible. However, the court does not find his conclusion as to the defendant's ability to knowingly waive his rights to be supported either by the interview itself or Dr. Young's own report. The defendant demonstrated during the interview an ability to understand the questions being asked of him, and more importantly, the gravity of the situation which he found himself in. He effectively used the interview to gather more information from the investigator than he yielded. The defendant took the opportunity to deflect suspicion away from himself.

. . . .

During Dr. Young's testimony, the court asked him if he had watched the defendant's interview. He stated that he had. The court then asked him if he was able to determine if the defendant appeared to understand the questions from Investigator Booker. Dr. Young stated that it wasn't clear to him one way or the other. It appeared to him that the defendant was more concerned about the female officer['s] searching him. This inability to draw a conclusion on the central issue is reflected in Dr. Young's report.

On page 26 of the report, Dr. Young wrote, "The ultimate question of legal concerns would appear to be whether or not [the Defendant] was able to understand his rights, as were laid out by Investigator Booker in the initial interrogation. The present data *cannot answer this question with total certainty*." . . .

The court concludes that the evidence presented indicates that [the Defendant] suffers from significant impairment of his mental functioning, particularly regarding his ability to process language. However, this impairment does not rise to the level that he is *unable* to comprehend what is being said to him at all times. . . .

Next, the trial court made thorough and comprehensive conclusions of law.

-34-

As its first conclusion of law, the trial court determined that the Defendant did not make an unequivocal request for counsel. The trial court set forth its reasoning, in part, as follows:

> The [D]efendant argues that his question, "[Do you know] when is that? . . . When the lawyer can come? [sic]" was an unequivocal request for counsel. However, as stated by the Tennessee Supreme Court in []Climer, 400 S.W.3d [at] 563 [], "Questions that merely probe the parameters of Miranda rights are properly characterized as 'equivocal statements made by a person who is still in the decision making process.'" (citing Saylor, 117 S.W.3d at 246). This court finds that [D]efendant's inquiry to be akin to statements that have previously been found to be equivocal statements regarding the right to counsel and not an actual request.[15]
>
> . . . .
>
> . . . In any event, after the [D]efendant's question regarding an attorney, the investigator appropriately made further inquiry, albeit a brief reiteration of the right on the waiver form, into the [D]efendant's right to counsel. [The Defendant] did not make any further statements regarding an attorney. He acknowledged his rights and agreed to speak with the investigator.

Thereafter, the trial court examined whether the Defendant voluntarily waived his Miranda rights. The trial court again made meticulous findings in concluding that, "although the [D]efendant has significant intellectual impairment as reported by Dr. Young, he did make a knowing, voluntary, and intelligent waiver of his Miranda rights." The trial court provided, in part, the following rationale:

---

[15] (citing Davis v. United States, 512 U.S. 452, 462 (1994) ("Maybe I should talk to a lawyer."); State v. Turner, 305 S.W.3d 508, 511, 520 (Tenn. 2010) ("Um, how quick will my lawyer get here?"); Saylor, 117 S.W.3d at 243-44 ("Well . . . I guess it don't matter until I can get a lawyer present."; "I'm supposed to have a lawyer though, don't I?"; "I have to have a lawyer present, I reckon. Before you ask me. That's the story, isn't it?"; "You have to have a lawyer present before questioning."; and "I might need a lawyer because somebody might try to accuse me of something I didn't do."); State v. Mitchell, 137 S.W.3d 630, 636-37 (Tenn. Crim. App. 2003) ("Do you think I need a lawyer?"); State v. Michael James Bell, No. E2008-01499-CCA-R3-CD, 2010 WL 3612751, at *24 (Tenn. Crim. App. Sept. 17, 2010) ("I think I need to talk to a lawyer."); State v. Adam Sanders, No. M2005-02185-CCA-R3-CD, 2006 WL 3516210, at *8 (Tenn. Crim. App. Dec. 6, 2006) ("I guess I need a lawyer, don't I?"); State v. James Robert Ledford, No. E1999-00917-CCA-R3-CD, 2000 WL 1211312, at *9 (Tenn. Crim. App. Aug. 28, 2000) ("Don't I need to talk to a lawyer?"); State v. James Clayton Young, Jr., No. 01C01-9605-CC-00208, 1998 WL 258466, at *12 (Tenn. Crim. App. May 22, 1998) ("I'm sorry, I'm just wondering if I should have a lawyer."); State v. John M. Ake, No. 01C01-9603-CC-00094, 1997 WL 311908, at *2 (Tenn. Crim. App. June 6, 1997) ("I probably need to get a lawyer, don't I?")).

The [D]efendant is a relatively young man. At the time of the interview, he was [twenty-two] years old. It appears from Dr. Young's report that the [D]efendant struggled through school and apparently did not graduate. Instead he participated in a work based learning program. He scored a [f]ullscale IQ standard of 87 during testing by Dr. Young. . . . However, based upon his conduct during the interview, the court finds that his age and intellectual struggles are not so pervasive that it would be impossible for him to make a knowing, voluntary, and intelligent waiver. . . .

There was not a great amount of evidence presented concerning the [D]efendant's specific prior experience with the police and courts. . . . It is clear this was not the [D]efendant's first foray into the criminal justice system. Beyond that, the court cannot speculate.

. . . The portion of the interview involving questions by Investigator Booker concerning the shooting lasted only [fourteen] minutes. A significant portion of this time entailed the <u>Miranda</u> rights explanation. . . .

. . . .

The [D]efendant was not injured, intoxicated, or ill during the questioning. He seemed to have full possession of his mental faculties, to whatever extent he possessed them in the first place. . . .

Although, Dr. Young discovered significant deficiencies in the [D]efendant's mental capacity, the fact that a person suffers from certain mental deficiencies does not necessarily prevent that person from understanding and waiving his or her constitutional rights. See State v. Middlebrooks, 840 S.W.2d 317, 327 (Tenn. 1992) . . . .

The court finds the most persuasive factor in this case to be the [D]efendant's demeanor and responsiveness to the questions during the interrogation. Throughout the interview, the [D]efendant seemed to have a solid grasp of the situation and the dire consequences which he faced. He was able to relate specific factual details to explain his whereabouts in relation to time. He put forward an explanation for any potentially incriminating evidence revealed by the police. In fact, he effectively used the interview to garner information about the case against him. The language he used was on a similar level as to the language used to explain his rights. Although he spoke in slang often, he appeared to be able to communicate clearly with the investigator. He also demonstrated that he

was aware he could ask questions about his rights when he inquired about when a lawyer would be appointed.

. . . After being explained his right to remain silent, consult with an attorney, and stop questioning at any time, he indicated that he wanted to speak with the investigator so he could find out what was going on. He then used the interview to do just that, find out what was going on. He made some potentially incriminating statements during the interview (and while he was alone in the interview room), but he made very few admissions against interests and certainly did not confess to any crime to the investigators.

D. *Application*

From our examination of the record and our own review of the video recording, we conclude that the trial court properly denied the Defendant's motion to suppress. First, we agree with the trial court that the Defendant's inquiry—"Do you know when is that? . . . You know when is that? . . . When the lawyer can come?"—was not an unequivocal invocation of the Defendant's right to counsel. The trial court set forth the relevant caselaw and provided pertinent examples in support of its conclusion. Furthermore, as the trial court noted, Investigator Booker did not simply ignore the Defendant's question but briefly attempted to explain the process and timing for obtaining a lawyer, including re-reading the right on the waiver form, and the Defendant did not make any further statements regarding an attorney. The Defendant then acknowledged his rights and agreed to speak with the investigator.

Moreover, the trial court considered the relevant factors in making its determination that the Defendant voluntarily, knowingly, and intelligently waived his Miranda rights. The Defendant relies on Dr. Young's testimony for the proposition that, due to a combination of a brain injury and Detective Booker's method of reviewing the Defendant's rights with him, he was unable to comprehend his Miranda rights as presented to him. However, as the trial court noted, "the fact that a person suffers from certain mental deficiencies does not necessarily prevent that person from understanding and waiving his or her constitutional rights." The Defendant not only appeared to understand all of the questions Investigator Booker posed to him, but he gave explanations for any incriminating evidence presented to him. For example, the Defendant claimed that his car had been stolen and that he had shot a gun the day before in the woods. Moreover, the trial court correctly assessed that the Defendant, who did not appear to be injured, intoxicated, or ill, effectively used the interview to garner information about the case against him. Finally, the trial court determined that even Dr. Young, himself, could not say for "total certainty" whether the Defendant was unable to understand his rights as laid out by Investigator Booker. The evidence does not

preponderate against the trial court's findings of fact in this regard, and its ultimate legal conclusions were well-founded.

### III. *Guns and Ammunition*

The Defendant, relying on general rules of relevance, argues that trial court erred by permitting the State to introduce "numerous items of weaponry, seized during a search at 1605 Moses Avenue, in that those items lacked any evidentiary value and were presented by the State for the sole purpose of prejudicing the jury into believing that [the Defendant] was engaged in other criminal activities." The State responds that the trial court acted within its discretion in admitting photographs of two firearms found in the home into evidence.

Prior to trial, the Defendant filed a "Motion in Limine #1: Evidence Seized at 1605 Moses Avenue," seeking to exclude "any evidence" seized during the search executed of that residence, "other than testimony regarding the discovery" of the Defendant. The motion referenced "drugs, a drug scale, drug paraphernalia, ammunition, and weapons." According to the Defendant, "[n]one of the items seized belonged to [him], nor c[ould] the police connect any of the[] items to the shooting of Ms. Brown." Moreover, the Defendant contended that these items were not relevant to the charged offenses, were highly prejudicial, and their introduction violated his right to fair trial.

It is appears from the technical record that this motion "came on for hearing" on February 26, 2014. The minute entry reflects, "Having heard the proof in this cause and having heard argument of counsel said [m]otion is hereby granted in part." On April 9, 2015, the Defendant filed a "Supplement to Motion in Limine #1." In this motion, the Defendant acknowledged that "the twenty-six 7.62 rounds and . . . the AK-47 assembly instruction" were relevant but submitted that "[t]he remaining items [were] inadmissible because they [did] not make any material issue in [the Defendant's] case more of less probable." He continued, "These items [were] further inadmissible because their probative value [was] substantially outweighed by danger of unfair prejudice, confusion of the issue, and misleading the jury, and by considerations of undue delay." The Defendant cited Jones v. State, 489 S.W.2d 44 (Tenn. Crim. App. 1972); State v. Kenneth Spencer, No W2012-02720-CCA-R3-CD, 2014 WL 1410317 (Tenn. Crim. App. Apr. 10, 2014); and State v. Gabriel Antonio Clark, No W2000-02595-CCA-R3-CD, 2001 WL 1042116 (Tenn. Crim. App. Sept. 7, 2001), in support of his argument. He also argued that these items amounted to inadmissible character evidence.

On May 11, 2015, prior to voir dire, the defense argued the supplemental motion, contending that the "drugs, ammunition, [and] guns" found at 1605 Moses could not be connected to the Defendant. Although defense counsel stated that "drug-related items" were included in his relevancy argument, he clarified, "I'm arguing a different position if

there's a connection between [the Defendant] and the handguns that are found laying [sic] on the steps—underneath the steps down in the first floor. I don't know that there's any connection to him and those guns." The prosecutor replied,

> All witnesses identify the shooter as using . . . something like an AK-47 with a drum magazine. It is unquestionable that a drum magazine was found at the Moses address, tons of ammunition. We expect our proof to show that [the Defendant] had been at that residence the night before, that he was there before the shooting, that this is the place where he went to get the automatic weapon, and that he returned to that place . . . after he fled the scene of the shooting.
>
> . . . So, clearly, we think that this is a place where [the Defendant] knew that he could have shelter, a place where he went when he needed to procure the weapon that he used in this homicide, and I think the jury is entitled to view all of the evidence. So I don't think the State has to show that there is a specific connection between each article of evidence and him. I mean, this is just circumstantial evidence of his culpability in the crime.
>
> Thereafter the trial court ruled,
>
> The [c]ourt believes the connection that has to be made is the connection of relevance, and the allegations in this case involve a shooting. I would not be surprised if we hear testimony of more than one gun being involved in the shooting, so the fact that there may be weapons and ammunition in the home where [the Defendant] was allegedly found is certainly relevant, it has a high degree of relevance to this. And even if there was more than one gun found there, I think that relevance is not outweighed by the danger of unfair prejudice under 403. And however, . . . I haven't heard anything about why—the fact that there was drugs or drug paraphernalia in the house has any degree of relevance and does have some degree of unfair prejudice . . . .

The prosecutor interjected, stating that she "really wasn't expecting to address this because [the trial court] had ruled on that issue previously[.]" The prosecutor said that she had "excluded those [drug] photographs because [she] didn't really think it had any connection" but noted "the fact of drugs and drug ingestion . . . [was] something that [was] gonna come up" because there would "be evidence presented that [the Defendant] was under the influence of an intoxicant." The trial court then decided that before any drug evidence was admitted, the State was required to "approach the bench" to "make the sure the door ha[d] been open, that there [was] enough of a foundation that could make the drugs in the home relevant."

-39-

During the trial, the trial court recollected,

> We—yeah, we still have that—the drug issue.  I went back and looked, and we actually did argue this in 2014, and I actually said weapons and ammo okay, the drugs, not okay.  So at the point that you think that the drugs are relevant and need to come in, I mean—
>
> . . . .
>
> I don't suspect that it's gonna be a big issue, but if we're making the point that [the Defendant] was staying . . . there at the Williams house, then I guess it's a danger of unfair prejudice.
>
> . . . .
>
> Yeah, a connection—to the house.  All right.

Ultimately, the State did not seek to introduce any of the drugs or drug-related items.

However, the State did introduce at trial 126 photographs of the residence at 1605 Moses.  Those photographs included the following:  (1) seven photographs of a magazine drum, loaded with two 7.62 x 39 rounds, that was found under the bed on the main level bedroom; (2) ten collective photographs of a box of .380 automatic ammunition with twenty-six rounds inside and of a bag of forty-five .38 special caliber bullets, both of which were found in a clothes hamper in the main level bedroom; (3) five collective photographs of a 7.62 x 39 bullet found behind the living room television and of another 7.62 x 39 bullet found inside a black vase next to that television; (4) three photographs of a 7.62 x 39 bullet found in a remote control caddy in front of the living room television; (5) one photograph of a firearm holster found in an upstairs bedroom; (6) three photographs of a pan on an upstairs bedroom desk with sugar and four 7.62 x 39 rounds inside; (7) three photographs of a cartridge, in that same upstairs bedroom, containing fifty-nine .22 caliber bullets; (8) fifteen collective photographs of a bag of fifteen 7.62 x 39 bullets, a "little magazine" of ten bullets, a Daisy laser sight, four lose bullets, a lose 7.62 x 39 round, a loose bullet or shell, and a scope—all found inside several dresser drawers in an upstairs bedroom; (9) two photographs of scope covers outside of an upstairs closet; (10) two photographs of an SKS wood stock located inside an upstairs closet; (11) four photographs of a chest drawer containing a shotgun shell; (12) nine photographs of a safe found in an upstairs bedroom containing a twenty-five-round box of twelve-gauge hunting cartridges, a 525-bullet box of .22 caliber ammunition, a bag of two different kinds of ammunition (forty-six in total), and another bag with nine bullets; (13) one photograph of another drawer with two "bullets or shell casings"; (14) three photographs of AK-47 assembly instructions; (15) two photographs of a firearm holster

in an upstairs closet; (16) ten photographs of an entertainment center in an upstairs bedroom showing an assault rifle magazine, a box of 7.62 x 39 ammunition with two bullets inside, and another box of 9mm ammunition with two bullets inside; (17) three photographs of another closet area and a firearm holster found inside; (18) four photographs of a nylon pouch and the nine shotgun shells inside; (19) two photographs of yet another firearm holster; (20) two photographs of a black plastic gun box; (21) fifteen collective photographs of two handguns found in the basement (a Highpoint 9mm and an RG .22 caliber revolver), an empty 9mm magazine, and six empty shell casings loaded in the revolver; and (22) three photographs of yet another bag of ammunition found on outside staircase with twenty-two bullets of two different kinds of ammunition inside. After presentation of the photographs, all of 7.62 x 39 ammunition, the black magazine drum, and the AK-47 instructions were admitted as physical exhibits.

Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978). "The admissibility of evidence under Rule 403 of the Tennessee Rules of Evidence is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion." State v. Biggs, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006) (citing State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997)).

At the outset, we must again discuss the issue of waiver. The February 26, 2014 minute entry suggests that a hearing was held on the Defendant's motion and that the trial court granted the Defendant's motion in part. The prosecutor noted that the issue had been ruled on previously. During the trial, the trial court affirmed that the issue had been addressed earlier and ruled upon at a 2014 hearing. However, no transcript of the February 26, 2014 hearing is included in the appellate record. Without this prior transcript we cannot know for certain what the parties argued at the hearing or the details of the trial court's ruling. Accordingly, the Defendant's failure to include a complete record of the proceedings forming the basis of this issue results in a waiver of any challenge to the trial court's ruling. See State v. Ballard, 855 S.W.2d 557, 560-61 (Tenn. 1993) (determining that the appellant's failure to provide the court with a complete record relevant to the issue presented constitutes waiver of the issue); see also Tenn. R. App. P. 24(b). Our review is again limited to one for plain error. See Tenn. R. App. P. 36(b).

The State on appeal references only photographs of two firearms as objectionable evidence, ignoring that, in total, 126 photographs of 1605 Moses were admitted into evidence, [16] that only fifteen of those photographs related to the two firearms, and that most of the others depicted additional ammunition and weapons-related items found in the home. We have cited above the laundry list of photographs showing weapons, weapons-related items, and ammunition that were in fact admitted at trial. We cannot help but observe that many of the photographs regarding weapons and ammunition found at the Moses Avenue address was multitudinous and superfluous. Numerous items, except for evidence concerning the AK-47, were never connected to the Defendant. While he was found hiding in the basement of that home, he did not live there, and little evidence was presented about how often he frequented there. Moreover, the bulk of those same items were not linked to the shooting at issue in this case.

Regardless, Tennessee Rule of Appellate Procedure 36(b) states that "[a] final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). In the cases cited by the Defendant, while the courts found error in admission of the evidence, the courts also determined that its admission was harmless. In Jones, the court found that the erroneous admission of testimony regarding a revolver that was not used in the commission of the offense at issue was harmless error because there was no proof that the admission of this evidence affected the outcome of the trial and because defense counsel fully developed the issue on cross-examination. 489 S.W.2d at 45-46. This court held in Spencer that, in a prosecution for premeditated murder, handguns and ammunition found at the defendant's home that were not connected to the murder and were not the weapon that killed the victim were irrelevant, but admission of the evidence was harmless error. 2014 WL 1410317, at *4-6. Finally, in Clark, although admission of the defendant's statement was improper because the defendant's possession of two weapons upon his arrest had no connection to the murder or robbery of the victim in the charged offense at issue, rendering the statement irrelevant, but its admission did not affect the results of the trial and was clearly harmless. Clark, 2001 WL 1042116, at *4-5

We similarly conclude that, while admission of a good deal of the weapons, weapons-related items, and ammunition violated the rules of evidence, the evidence of the Defendant's guilt was so overwhelming that the error was harmless. The Defendant admitted that he was the shooter, and multiple eyewitnesses identified him. The Defendant had a motive for the shooting, and he procured a weapon from 1605 Moses,

---

[16] The Defendant in his appellate brief notes that "the State was allowed to introduce to the jury 126 photos of numerous items of weaponry, seized from the Williams' residence, as well as to introduce as trial exhibits [nine] pieces of weapons[.]"

where he knew one could be found. The forensic evidence established that the bullet that killed the victim came from the Defendant's gun, and the only physical evidence admitted related to the AK-47, the weapon used in the shooting. In addition, the Defendant fled from the scene, disposed of the AK-47, which was never found, tried to rid himself of gunshot residue, and attempted to hide from police. We can say with confidence that any improper admission of the challenged evidence did not affect the outcome of the Defendant's trial. Accordingly, the plain error doctrine can afford no relief to the Defendant—no substantial right of the Defendant has been adversely affected, and substantial justice is not at stake. See Smith, 24 S.W.3d at 282 (quoting Adkisson, 899 S.W.2d at 641-42). Therefore, this issue does not provide the Defendant with relief.

## IV. *Sufficiency of the Evidence*

The Defendant challenges the sufficiency of the evidence, arguing that the evidence did not support his convictions for first degree murder and aggravated assault. Specifically, regarding his first degree murder conviction, the Defendant points to lack of proof that he was "the shooter who caused the death of Uniqua Brown" or that he acted with "premeditation and intent to kill." With respect to his aggravated assault convictions, the Defendant states simply that "the State failed to prove beyond a reasonable doubt that Jasmine Hollingsworth and Akeem Hollingsworth were put in fear for their lives as a result of [his] intentional actions" and does not elaborate further. The State counters that the evidence supports the verdicts.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265,

275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

First degree murder, in this instance, is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d).

The element of premeditation is a factual question to be decided by a jury from all the circumstances surrounding the killing. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although a jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that factors demonstrating the existence of premeditation include, but are not limited to, the following: the declaration of the intent to kill, the procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, the infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, the destruction or secretion of evidence, and calmness immediately after the killing. State v. Jackson, 173 S.W.3d 401, 409 (Tenn. 2005); State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000). Additional factors cited by this court from which a jury may infer premeditation include lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). Further, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004).

The Defendant argues that evidence showed that the Defendant "exchanged fire at least with one other shooter," and therefore, the State did not prove beyond a reasonable doubt that it was a bullet from his gun that struck Ms. Brown. Additionally, the Defendant cites to his own testimony at trial as evidence that he did not act "with premeditation and intent to kill Uniqua Brown, or for that matter, . . . anyone else at the [Brown-]Maples' residence." According to the Defendant, the record demonstrates that he went to the home "with only the intent to try to retrieve the money" that had been taken from his brother during the robbery the prior evening. However, we agree with the

-44-

State that the evidence, when viewed in the light most favorable to it, establishes that it was the Defendant who shot Ms. Brown and that he did so with premeditation and intent to kill.

First, the evidence did not conclusively establish that anyone else shot that day. The Defendant, himself, was unable to testify with certainty if the man he saw pointing a gun fired at him. Mr. Maples was unable to state for sure that Mr. Dixson shot his .45 that day. Regardless, forensic evidence established that all of the bullets that entered the Chevy Caprice came from the street, where the Defendant was the only shooter.

The Defendant submits that the medical examiner's testimony established "that Ms. Brown was killed by a *bullet ricochet*." However, this is an improper characterization of her testimony. Dr. Mileusnic-Polchan stated, "[T]here are a couple of interesting findings here that might point toward the existence of an intermediate target, that the bullet hit something else before reaching Uniqua's body." Ms. Brown was seated in the front seat of the Chevy; any bullet that struck her would have first passed through the exterior of the car. Dr. Mileusnic-Polchan concluded that Ms. Brown was shot in the back while leaning forward. Moreover, the Defendant, during his own testimony, acquiesced that the bullet that killed Ms. Brown must have come from his weapon.

Additionally, we note that whether a defendant was acting in self-defense is a question of fact for the jury. Echols, 382 S.W.3d at 283. The jury was free to reject any self-defense claim.

Finally, regarding premeditation, the Defendant learned that his brother had been robbed the night before; a fact that observers said made him enraged. This provided a motive. The jury was free to reject the Defendant's testimony that he went to the Brown-Maples residence simply to retrieve money. Furthermore, the Defendant procured an AK-47 from inside 1605 Moses, knowing the weapon was inside that house. Mr. O'Neill testified that he knew the Defendant's intent when they left the Moses Avenue residence—that it was not to retrieve money but to shoot. Once they arrived at the Brown-Maples residence, the Defendant fired off thirty-two bullets from the Toyota Camry as he passed by the Brown-Maples residence. The Defendant had been by the residence earlier, but he waited until he believed the men who had robbed his brother the evening before were present. The Defendant fled the scene after the shooting and hid inside 1605 Moses. He also instructed Mr. O'Neill to hide the car, disposed of the AK-47, and took off his shirt and attempted to clean himself of gunshot residue. This is sufficient evidence of premeditation.[17]

---

[17] We feel constrained to note that the common law doctrine of transferred intent, which provides that "a defendant who intends to kill a specific victim but instead strikes and kills a bystander is deemed guilty of

Regarding his two convictions for aggravated assault, the Defendant argues that the behavior of Jasmine and Akeem Hollingsworth did not demonstrate that they "were put in fear of their lives as a result of the Defendant's actions." Aggravated assault, as charged in this case, occurs when a person knowingly[18] causes the victim to reasonably fear imminent bodily injury through the use or display of a deadly weapon. See Tenn. Code Ann. § 39-13-101(a)(2), -102(a)(1)(A)(iii). According to the Defendant, because the siblings knew the Defendant was on his way to the Brown-Maples residence armed, and they did not flee, the siblings did not believe the Defendant intended to kill anyone and, therefore, were not in fear for their lives. However, Akeem testified that he "was scared for [his] life," and Jasmine said she was scared by the situation. Observers saw that the Hollingsworth siblings were visibly shaken and upset. In addition, the Defendant admitted on cross-examination that their reactions were genuine.

Moreover, the jury could reasonably infer that, when the Defendant used an AK-47 to spray thirty-two bullets in Jasmine and Akeem Hollingsworths' direction, they reasonably feared for their lives, despite any previous actions on their part. Both siblings fell to the ground to seek cover when the Defendant fired. "A victim's fear may be inferred from circumstances surrounding the offense." State v. Rico Vales, No. W2014-00048-CCA-R3-CD, 2015 WL 1094667, at *5 (Tenn. Crim. App. Mar. 9, 2015), perm. app. denied (Tenn. June 11, 2015); see State v. Lonta Montrell Burress, Jr., and Darius Jerel Gustus, No. E2013–01697-0CCA-R3-CD, 2014 WL 6855226, at *8 (Tenn. Crim. App. Dec. 4, 2014).

In as much as the Defendant also argues that the Hollingsworths' behavior prior to the shooting established that the Defendant lacked the intent to kill anyone when he drove to the Brown-Maples residence, the jury was free to resolve any conflicts in the evidence. See Bland, 958 S.W.2d at 659. Moreover, the beliefs of the Jasmine and Akeem Hollingsworth are not evidence of the Defendant's mental state. As discussed previously, the Defendant's first degree premeditated murder conviction is supported by the

_____

the offense that would have been committed had the defendant killed the intended victim," has a checkered history in this state. Millen v. State, 988 S.W.2d 164, 166-67 (Tenn. 1999) (citations omitted) (recounting history of application of transferred intent doctrine). In Millen, our supreme court concluded that "the transferred intent rule has little application under our modern statutory law." 988 S.W.2d at 167. The court observed that "[a] plain reading" of the first degree murder statute "indicates that a defendant's conscious objective need not be to kill a specific victim. Rather, the statute simply requires proof that the defendant's conscious objective was to kill a person, i.e., 'cause the result.'" Id. at 168. The court held that so long as "the evidence demonstrates that the defendant intended to 'cause the result,' the death of a person, and that he did so with premeditation and deliberation, then the killing of another, even if not the intended victim (i.e., intended result), is first degree murder." Id. However, the court noted that the "unintended victim" cases are more appropriately prosecuted as felony murder. Id. at 167-68.

[18] Although the conduct can be established through intentional or knowing behavior, the trial court here only the charged the lesser mens rea of knowing.

-46-

evidence.  The evidence is likewise sufficient to support the aggravated assault convictions.  See, e.g., State v. Antwion Dowdy, No. W2015-02342-CCA-R3-CD, 2016 WL 7654950, at *13-14 (Tenn. Crim. App. 2016) (affirming sufficiency of the evidence supporting the defendant's convictions for first degree murder and four aggravated assaults under a similar factual scenario).  The Defendant is not entitled to relief from this issue.

## V. *Diminished Capacity Instruction*

The Defendant submits that the trial court should have instructed the jury on diminished capacity and that the failure to do so "resulted in great prejudice" to his rights. The Defendant submits that he was entitled to the diminished capacity instruction because the record "contain[ed] evidence that the Defendant suffer[ed] from a significant intellectual impairment, resulting from the damage to his left brain hemisphere, he received at birth."  The State responds that the issue is waived and that the Defendant has failed to demonstrate plain error.

Special instructions are given "to supply an omission or correct a mistake made in the general charge, to present a material question not treated in the general charge, or to limit, extend, eliminate, or more accurately define a proposition already submitted to the jury."  State v. Cozart, 54 S.W.3d 242, 245 (Tenn. 2001), overruled on other grounds by State v. White, 362 S.W.3d 559 (Tenn.2012).  The Defendant never requested a special instruction on diminished capacity, either orally or in writing, and the issue was not presented in the Defendant's motion for new trial.  Thus, the issue is waived.  See Tenn. R. App. P. 3(e); Tenn. R. App. P. 36(a); Tenn. R. Crim. P. 30(a) (envisioning that special requests for jury instructions be made in writing).  Our review is once more limited to one for plain error.  See Tenn. R. App. P. 36(b).

Under Tennessee law, evidence of a mental disease or defect that does not rise to the level of an insanity defense is nevertheless admissible to negate the requisite culpable mental state for the charged offense.  State v. Phipps, 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994).  In State v. Hall, our supreme court explained "diminished capacity" as follows:

> [D]iminished capacity is not considered a justification or excuse for a crime, but rather an attempt to prove that the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime but most likely guilty of a lesser included offense.  Thus, a defendant claiming diminished capacity contemplates full responsibility, but only for the crime actually committed.

-47-

958 S.W.2d 679, 688 (Tenn. 1997) (citations omitted). Such evidence is usually introduced through expert testimony showing that a defendant was incapable of forming a criminal intent by virtue of an impaired mental condition. State v. Adams, 405 S.W.3d 641, 660-61 (Tenn. 2013) (citations omitted). To justify an instruction on diminished capacity the proof must establish that any "inability to form the requisite culpable mental state *was the product of a mental disease or defect, not just a particular emotional state or mental condition*." Id. at 661(citing Hall, 958 S.W.2d at 690).

Moreover, mental health "testimony is properly admissible if it satisfies the relevancy and expert testimony provisions in the Tennessee Rules of Evidence[.]" State v. Ferrell, 277 S.W.3d 372, 379 (Tenn. 2009). "Assuming that those standards are satisfied, psychiatric evidence that the defendant lacks the capacity, because of mental disease or defect, to form the requisite culpable mental state to commit the offense charged is admissible under Tennessee law." Hall, 958 S.W.2d at 689.

The Defendant relies on Dr. Young's testimony at the suppression hearing as establishing his intellectual impairment and cites to Phipps, 883 S.W.2d 138, as supporting his argument that he was entitled to a diminished capacity instruction. However, Phipps does not mandate that this instruction be given. In Phipps, the trial court did not merely fail to instruct on diminished capacity, but the court instructed the jury not to consider diminished capacity in reaching its verdict. This court's holding addressed only the trial court's instruction to disregard diminished capacity, not the trial court's failure to instruct the jury on diminished capacity in its charge. To clarify this distinction, the court stated as follows:

> Tennessee law does not require the trial judge to instruct the jury that expert testimony may be considered in determining whether the requisite mental state existed. Our holding is not so broad. We hold only that, in the circumstances of this case, it was error to issue an instruction that suggested that testimony on defendant's mental defects could not be considered in determining whether the requisite mental state was proved.

Phipps, 883 S.W.2d at 151. Moreover, in this case, there was no evidence admitted at trial that the Defendant suffered from a mental disease or defect which could have affected his capacity to form the culpable mental state required to commit the charged offenses. Dr. Young did not testify at the Defendant's trial. Accordingly, the plain error doctrine can afford no relief to the Defendant—no clear and unequivocal rule of law has been was breached, no substantial right of the Defendant has been adversely affected, and substantial justice is not at stake. See Smith, 24 S.W.3d at 282 (quoting Adkisson, 899 S.W.2d at 641-42). As raised, this issue is without merit.

-48-

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
D. KELLY THOMAS, JR., JUDGE